# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-1010

ABRAHAM CARMICHAEL and
KEITH SAWYER,

*Plaintiffs-Appellants*,

*v.*

VILLAGE OF PALATINE, ILLINOIS,
TIMOTHY SHARKEY and STEVE BUSHORE,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-05221—**Virginia M. Kendall**, *Judge*.

ARGUED FEBRUARY 10, 2010—DECIDED MAY 21, 2010

Before RIPPLE, MANION and WILLIAMS, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Abraham Carmichael and Keith
Sawyer brought this action alleging Fourth Amendment[1]

---

[1] The plaintiffs divided their complaint into eight counts,
the first three of which presented the federal claims. Count

(continued...)

violations under 42 U.S.C. § 1983 against Officers Timothy Sharkey and Steve Bushore and against the officers' employer, the Village of Palatine ("Village"). They also alleged supplemental state claims arising out of the same incident.[2] The defendants moved for summary judgment on all claims against all parties, which the district court granted in its entirety. Mr. Carmichael and Mr. Sawyer now appeal. We conclude that the district court erred with respect to its treatment of two of the plaintiffs' claims, namely those related to the authority to make the initial stop and to the manner in which Mr. Sawyer was searched. We therefore reverse and remand in part the judgment of the district court.

---

[1] (...continued)
I alleged an unreasonable search and seizure, Count II alleged unlawful arrest and Count III alleged that the officers on the scene had used excessive force, all in violation of the Fourth Amendment. R.38.

[2] The plaintiffs' state law claims were as follows: Count IV alleged false imprisonment of Mr. Carmichael without probable cause; Count V alleged malicious prosecution of the case against Mr. Carmichael by Officer Sharkey; Count VI alleged intentional infliction of emotional distress on Mr. Carmichael by Officer Sharkey. Counts VII and VIII did not include additional substantive legal contentions, but alleged that the Village of Palatine was liable for Officer Sharkey's actions under a theory of respondeat superior and a state statute providing for the indemnification of public employees. *Id.*

# I

## BACKGROUND

### A.

On September 15, 2006, Mr. Sawyer and Mr. Carmichael met up with three women on the south side of Chicago. Mr. Carmichael and one of the women, Kita,[3] smoked marijuana together, and then all five individuals drove, in Kita's car, to a motel where they proceeded to drink and use other drugs. After some time, Mr. Carmichael borrowed Kita's car and drove to a nearby store. Mr. Sawyer rode along as a passenger; the women stayed behind.

As the men returned from the store to the motel parking lot and were beginning to exit the car, they heard someone order them to "freeze." R.78, Ex. 2 at 50. Mr. Carmichael turned and observed Officer Timothy Sharkey some ten-to-twelve feet away with his service revolver pointed at them. Following Officer Sharkey's commands, Mr. Carmichael stepped back into the car and placed his hands on the steering wheel. Officer Sharkey then approached and asked for Mr. Carmichael's license; Mr. Carmichael admitted that he did not have it. Instead, he produced a state ID. Officer Sharkey took the ID and went to his squad car.

When Officer Sharkey returned to the car containing the plaintiffs, he informed Mr. Carmichael that his license had been revoked. He asked for the vehicle information,

---

[3] The record does not disclose Kita's full name, nor does it disclose the names of the other women involved.

including insurance and registration; Mr. Carmichael could not produce them. Mr. Carmichael informed Officer Sharkey that the car belonged to someone else.

Officer Sharkey ordered Mr. Carmichael out of the car and conducted a search of his person without consent. The search turned up a bag of marijuana in Mr. Carmichael's jeans pocket. Mr. Carmichael then was handcuffed. By this time, Officer Steve Bushore had arrived on the scene.

Officer Sharkey next ordered Mr. Sawyer out of the car. Officer Sharkey conducted a pat-down search of Mr. Sawyer and handcuffed him as well. At this time, Mr. Sawyer asked Officer Sharkey why the men had been stopped. Officer Sharkey replied that he had pulled them over because the car did not have a front license plate and had tinted front windows. Officer Sharkey recanted these statements later and has maintained for some time—including in his official report from the night in question and in the proceedings in the district court in this case—that he stopped the car only because it did not have operational tail or brake lights. Kita's car did not, in fact, have a front license plate, because it had only a temporary rear plate. With regard to the tinted windows, the plaintiffs claim that the facts are in dispute. However, we agree with the district court that Mr. Carmichael's own deposition testimony and the photographs of the car establish that, at minimum, the driver's side front window was tinted. The plaintiffs presented no contrary evidence on this issue. There is a dispute about whether the window was down and therefore, whether the tint was visible at the time of the

initial stop. Notably, Officer Sharkey later admitted that, at the time of the stop, he was unaware of the car's tinted windows and also admitted "that tinted windows had nothing to do with his arrest of Carmichael." R.87 at 2 (Defendants' Response to Plaintiffs' 56.1 Statement). Officer Sharkey further admitted that he did "not know whether or not the vehicle that Carmichael was driving had a front license plate." *Id.*

Leaving the plaintiffs under the supervision of Officer Bushore, Officer Sharkey next conducted a full search of the interior of Kita's car. He uncovered a bag containing a significant quantity of crack cocaine. Officer Sharkey then returned to Mr. Sawyer and conducted a more complete search, the details of which are not in significant dispute. Officer Sharkey pulled Mr. Sawyer's pants partially down and pulled his underwear away from his body. Officer Sharkey shone a flashlight into Mr. Sawyer's pants and, when the search was complete, informed Mr. Sawyer that he was free to go.

Mr. Carmichael was placed under arrest and was taken to the Palatine police station. There, he was subjected to a full strip search. He received a citation for operating a vehicle without a license and for having no functioning taillights. He did *not* receive a citation for lack of a front plate or for operating a vehicle with tinted windows. He also was charged with a series of offenses related to the drugs recovered in the search of his person and of the vehicle.

In Mr. Carmichael's subsequent criminal proceedings, the Illinois judge set his bond at $100,000. Because he was unable to post bond, Mr. Carmichael remained in

custody for the four months that charges were pending against him.

At a hearing on Mr. Carmichael's motion to quash the arrest and to suppress the evidence obtained in the search, Officer Sharkey testified that the car had been stopped because it did not have functioning tail or brake lights, not because of the window tint or front license plate issues, the grounds he had mentioned in response to Mr. Sawyer's inquiry. It was stipulated that Kita's car had been towed from the motel to a body shop following the arrest and that the vehicle had remained in that location. An investigator employed by Mr. Carmichael's attorney had gone to the shop and had examined the vehicle; he testified that he had found its taillights to be operational. Based on this testimony, the trial judge in the criminal case concluded that probable cause did not support the initial seizure and granted Mr. Carmichael's motion to suppress. Indeed, the court stated that it "believe[d] that [Officer Sharkey] out and out lied in this courtroom" when he represented that he pulled the car over because of non-functioning taillights. R.78, Ex. 8 at 16. The court suggested, on the record, that the officer should be investigated and the case referred to the "civil rights violation department." *Id.* On motion of the prosecutor, the charges against Mr. Carmichael were dropped.

### B.

Mr. Carmichael and Mr. Sawyer then brought this civil rights action in the district court against Officers

Bushore and Sharkey and the Village. As we have noted, their complaint raised a variety of claims under § 1983, including unreasonable search and seizure, false arrest and excessive force, as well as a variety of pendent state law claims. The officers and the Village moved for summary judgment, contending principally that the plaintiffs had admitted sufficient facts to require a finding that probable cause supported the stop, the searches and the subsequent arrest. Specifically, the defendants noted that it is undisputed that, during the stop and search, Officer Sharkey told Mr. Carmichael and Mr. Sawyer that they had been stopped because of tinted windows and the absence of a front plate; both could have been violations of Illinois law sufficient to provide probable cause. Therefore, the defendants claimed, the search was objectively reasonable under the plaintiffs' version of the facts, and summary judgment was appropriate.

The district court held that Mr. Carmichael and Mr. Sawyer had waived many of their claims, including those for excessive force, unlawful detention of Mr. Sawyer and all of the state law claims. Turning to the Fourth Amendment search and seizure claims, the district court concluded that the fact of tinted windows and the lack of a front plate provided adequate probable cause for the initial stop, even though those violations were different than the officer's sworn statement providing his reasons for the stop (non-operating taillights). The district court specifically noted that

> the undisputed facts show that at the time Sharkey made the traffic stop, *he knew that the car that*

> *Carmichael had been driving had tinted windows and no front license plate* because he cited those reasons to Carmichael and Sawyer when they asked why he stopped their car and those statements are supported by the photos of the car that are in evidence.

R.94 at 12 (emphasis added). Because the probable cause inquiry turns on the conclusions that a reasonable officer could draw from "'the facts known to the [officer], when viewed objectively,'" the district court concluded that there had been no Fourth Amendment violation at the time of the stop. *Id.* (quoting *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007) (modification in original)). Concluding that the objective facts were sufficient to support the initial stop, the court saw no constitutional violation in the stop or in the subsequent search and arrest. The district court also rejected Mr. Sawyer's claim that he had been subjected to an unreasonable search, concluding that a search of all the individuals in the vehicle was constitutional after the discovery of the drugs. The court did not examine, in any significant detail, whether the search was carried out in an unreasonable manner.

## II

## DISCUSSION

We review de novo a grant of summary judgment. *Reget v. City of LaCrosse*, 595 F.3d 691, 695 (7th Cir. 2010). Summary judgment is appropriate when "the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). We view the facts in the light most favorable to the non-moving parties, here, Mr. Carmichael and Mr. Sawyer, and we draw all reasonable inferences in their favor. *Reget*, 595 F.3d at 695.

## A.

The Officers and the Village submit that the initial stop was supported by probable cause and therefore was reasonable under the Fourth Amendment. Specifically, they contend that Officer Sharkey had probable cause to believe that Mr. Carmichael had violated Illinois law in operating a vehicle with tinted front windows and without a front license plate. *See* 625 ILCS 5/12-503(a-5), 5/3-413(a). They further contend that Officer Sharkey's statements to the contrary in the arrest report, at the criminal trial and in his deposition that the reason for the stop was, instead, inoperative tail or brake lights, are irrelevant.

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Over time, the Supreme Court has developed a series of corollary principles to give effect to this basic constitutional mandate in the particular context of automobile searches. The temporary detention of an individual during the stop of an automobile by the police, even if only for

a short period of time and for a limited purpose, constitutes the seizure of a person within the meaning of this constitutional provision. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Consequently, an automobile stop is subject to the "constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.*; *see United States v. Watson*, 423 U.S. 411, 417-18 (1976); *Brinegar v. United States*, 338 U.S. 160, 164 (1949).[4] "Whether probable cause

---

[4] Under certain circumstances, the stop of an automobile without probable cause related to a vehicle violation or any other crime is reasonable under the Fourth Amendment. The Supreme Court has upheld the use of checkpoints in which brief stops are made without any individualized suspicion. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 455 (1990) (temporary sobriety checkpoints stopping all vehicles); *United States v. Martinez-Fuerte*, 428 U.S. 543, 562 (1976) (fixed immigration checkpoint in the interior of the United States). The Court also has approved of minimally invasive stops conducted by roving patrols near the border to question occupants about immigration status on something less than probable cause. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (plurality opinion) (requiring reasonable suspicion). *But see City of Indianapolis v. Edmonds*, 531 U.S. 32, 41 (2000) (vehicle checkpoints "to detect evidence of ordinary criminal wrongdoing," such as narcotics, without individualized suspicion violate the Fourth Amendment); *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973) (probable cause necessary for search of any vehicles conducted

(continued...)

exists depends upon the reasonable conclusion to be drawn from the facts known" to the officer at the time he acts. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The Supreme Court has made clear that the probable cause inquiry is an *objective* one; the subjective motivations of the officer do not invalidate a search otherwise supported by probable cause. *Whren*, 517 U.S. at 812-13 (collecting cases). Importantly, however, "probable cause depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard." *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992) (emphasis in original); *see also Devenpeck*, 543 U.S. at 153 ("Our cases make clear that an arresting officer's state of mind *(except for the facts that he knows)* is irrelevant to the existence of probable cause." (emphasis added)); *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007) (noting that probable cause exists at the moment when "the facts and circumstances within [the officers'] knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense" (internal quotation marks omitted)).

These principles require, then, that we focus our inquiry on the objective reasonableness of the officer's

---

[4] (...continued)
by roving immigration patrols several miles into the interior of the United States).

conduct on "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The reasonableness of the seizure turns on what the officer knew, not whether he knew the truth or whether he should have known more. *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007). We "only care about what the officer knew at the time the decision was made." *Id.*

The district court concluded that Officer Sharkey observed the possible vehicle violations regarding the plates and the tinted windows when he made the stop because he verbally cited those reasons in answer to an inquiry from Mr. Sawyer during the stop. Notably, however, by the time he uttered those reasons to Mr. Sawyer, Officer Sharkey was well into his investigation and knew a great deal more about the men, the contraband and the car than he had known when he drew his service revolver and shouted "freeze." Indeed, at that time, he already knew that the car contained drug paraphernalia and that Mr. Carmichael had operated the vehicle without a license. He knew that Mr. Carmichael had marijuana on his person. None of these facts, however, assists us in determining whether *at the moment that Officer Sharkey made the stop*, he had sufficient facts to conclude that probable cause existed to believe traffic

laws had been violated. *See Reynolds*, 488 F.3d at 765 ("The fact that an officer later discovers additional evidence unknown to her at the time of the arrest . . . is irrelevant—we only care about what the officer knew at the time the decision was made.").

Officer Sharkey has, from the moment he filed the arrest report, maintained that his reason for stopping the car was inoperative tail and brake lights. More importantly, however, all of the defendants, including Officer Sharkey, admitted, in their response to plaintiffs' 56.1 statement, that Officer "Sharkey *did not observe tinted windows* on the vehicle Carmichael was driving before he stopped the vehicle," and that he "does not know whether or not the vehicle that Carmichael was driving had a front license plate." R.87 at 2 (emphasis added); *see also* R.78, Ex. 8 at 6 (noting, in response to plaintiffs' counsel's question about whether Officer Sharkey knew that the car had tinted windows, that he "*did not observe anything else* [other than the brake lights] on the vehicle that [he] knew to be a traffic violation at the time." (Sharkey dep. at 24) (emphasis added)). Officer Sharkey's statement to Mr. Sawyer about tinted windows and a front license plate may be based on what he observed *after* the stop, but, by his own admission, they are not what he knew when he effected the stop. Accordingly, we must conclude that the district court misapprehended the record when it based its determination that Officer Sharkey had probable cause to effect the arrest on the basis of tinted windows and the absence of a front license plate.

Our earlier discussion should make clear—but we pause to emphasize—that our focus on the facts Officer

Sharkey knew at the time that he decided to stop the vehicle, as evidenced by the defendants' admission and Officer Sharkey's own statements, should not be misread as adopting a subjective standard that focuses on Officer Sharkey's motivations. *See Williams*, 509 F.3d at 398-99. Indeed, this case involves a straightforward application of the objective test set forth by the Supreme Court in *Whren*, which requires us to evaluate probable cause from the perspective of a reasonable officer who saw what Officer Sharkey saw and heard what he heard. *See United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005). The objective perspective dictated by *Whren* and its progeny prevents courts from eschewing objective facts in favor of evaluating the subjective motivations of a particular officer; however, it is not meant to give an arresting officer the added benefit of any facts that come to light after a relevant Fourth Amendment decision has been made. *See Devenpeck*, 543 U.S. at 153, 154 (noting the purposes of the objective test, including its assurance "that the constitutionality of an arrest under a given set of *known facts*" will not vary "from place to place and from time to time" (internal quotation marks omitted)).

The record before us requires us to conclude that the district court erred in finding that probable cause supported the stop. The court did not fail to use the objective test of probable cause; it simply misapprehended the facts which the summary judgment record demonstrates were not within the officer's knowledge at the time the stop was made.

**B.**

We now turn to Officer Sharkey's claim that he enjoys qualified immunity on the claim that he stopped the vehicle in violation of the Fourth Amendment. In *Wheeler v. Lawson*, 539 F.3d 629 (7th Cir. 2008), we summarized the basic principles governing the law of qualified immunity:

> The doctrine of qualified immunity shields from liability public officials who perform discretionary duties, *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007), and it thus protects police officers "who act in ways they reasonably believe to be lawful." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). The defense provides "ample room for mistaken judgments" and protects all but the "plainly incompetent [or] those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, [229] (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Qualified immunity protects those officers who make a reasonable error in determining whether there is probable cause to arrest an individual. *Anderson*, 483 U.S. at 643; *Belcher v. Norton*, 497 F.3d 742, 749 (7th Cir. 2007).

*Wheeler*, 539 F.3d at 639 (parallel citations omitted).

Our discussion up to this point should make abundantly clear that Officer Sharkey is not entitled to qualified immunity with respect to the stop. We summarized the governing principles on qualified

immunity in the context of probable cause in *Williams v. Jaglowski*, 269 F.3d 778 (7th Cir. 2001):

> Whether police officers had probable cause to arrest a suspect and whether they are entitled to qualified immunity for the arrest are closely related questions, although qualified immunity provides the officers with an "additional layer of protection against civil liability" if a reviewing court finds that they did not have probable cause. *Hughes v. Meyer*, 880 F.2d 967, 970 (7th Cir. 1989). In an unlawful arrest case in which the defendants raise qualified immunity as a defense, this court will "determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). If the officers can establish that they had "arguable probable cause" to arrest the plaintiff, then the officers are entitled to qualified immunity, even if a court later determines that they did not actually have probable cause. *Id*. Accordingly, we will affirm the district court's grant of summary judgment if we find that "a reasonable police officer in the same circumstances and with the same knowledge . . . as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Id*.

*Williams*, 269 F.3d at 781 (emphasis in original).

The record before us contains no evidence that Officer Sharkey had any factual basis for stopping the plaintiffs at gun point. He admits that the reasons that he initially gave for stopping the car—absence of a front license plate and tinted windows—were not known to him at the time that he effected the stop. The record shows, moreover, that the reason that he later gave for the stop—the absence of tail and brake lights—was not true. As the state court determined during the earlier criminal proceeding against the plaintiffs, there is simply no basis in the record upon which a determination of probable cause can be sustained. Certainly, any reasonable police officer, acting at the time Officer Sharkey acted, would have known this elementary principle of the law of arrest.

## C.

Mr. Sawyer asks us to review his claim that he was subjected to an unreasonable search when—in a parking lot adjacent to a public street—Officer Sharkey pulled down Mr. Sawyer's pants, pulled his underwear away from his body and directed him to "bend over."

This claim was litigated in a perfunctory manner before the district court. Although the defendants moved for summary judgment on all claims, their memorandum in support of summary judgment made no mention whatsoever of Mr. Sawyer's claim that he had been searched in an unreasonable manner under the Fourth Amendment. The plaintiffs' responsive summary judgment filings also make no specific mention of this claim, other

than to repeat their factual allegations regarding the manner of the search.

Under these circumstances, the absence of *any* statement by the defendants as to the facts and law that entitled them to summary judgment on this claim made the grant of summary judgment inappropriate. In *Wheeler*, we had occasion to summarize the principles that govern the litigation of summary judgment motions before the district court:

> The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex* [*Corp. v. Catrett*], 477 U.S. [317,] 323 [(1986)]. To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Anderson* [*v. Liberty Lobby*], 477 U.S. [242,] 251-52 [(1986)]. The nonmoving party must show that there is evidence upon which a jury reasonably could find for the plaintiff. *Id*.

539 F.3d at 634 (parallel citations omitted).

The first of these principles was not fulfilled in this case. The defendants, the moving party on the summary judgment motion, never fulfilled the obligation of setting

forth the basic facts and law which, in their view, warranted summary judgment on this claim. The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority pertaining to the strip search, the defendants sought summary judgment on all claims against all parties.

Although the district court addressed this claim, it did so in summary fashion and never addressed the gravamen of Mr. Sawyer's complaint that it was the *manner* of this search that violated the Fourth Amendment. We believe that this claim must remain open on remand. If Officer Sharkey files a renewed motion for summary judgment with respect to this claim and fulfills his threshold responsibility of setting forth the facts and law that he believes warrant summary judgment in his favor, Mr. Sawyer must then shoulder the responsibility of demonstrating that there is a genuine issue of triable fact.

### D.

In its order granting summary judgment, the district court determined that all of the plaintiffs' pendent state law claims had been waived. The district court was correct. The summary judgment record demonstrates that, in contrast to the strip-search claim that we discussed earlier, the defendants met their obligations with respect to these state claims by directly addressing them, with citation to relevant authority and pertinent facts. By contrast, the plaintiffs' response on these claims was cursory at best and included not a single citation to any relevant state

authority. They now ask us to overturn the district court's waiver determination, but do so only in the most conclusory manner. Their argument contains no specific reference to the legal requirements necessary to establish any of the state law claims. Indeed, the state tort claims are merely bundled together with the federal constitutional claims, and all of them are addressed in a single paragraph. *See* Reply Br. 8 ("Because there was no probable cause, then everything else was unconstitutional."). Given this treatment of the state claims, both on appeal and in the district court, there is no basis for our reversal of the district court's determination.

For the same reason, we cannot address, much less overturn, the district court's determination with respect to the remainder of the plaintiffs' federal constitutional claims alleging excessive force, an illegal search of Mr. Carmichael and the false arrest or unlawful seizure of both men. On these federal claims, the plaintiffs assert, in conclusory fashion, only that "because there was no probable cause, the lynch pin [sic] for defendants' arguments fails, the conduct of the defendants must be seen in a different light, and the district court erred in [granting summary judgment on] these claims." Appellants' Br. 11. The plaintiffs, however, have not made any independent, substantive legal arguments about the legality of the officers' conduct subsequent to the initial stop and search. We agree that this amounts to a waiver of these claims.

**Conclusion**

For the foregoing reasons, we must reverse the district court's judgment with respect to the initial stop of Mr. Carmichael and Mr. Sawyer. We also must reverse its judgment with respect to Mr. Sawyer's claim that he was searched in a manner violative of his rights under the Fourth Amendment. In all other respects, the judgment of the district court is affirmed. Mr. Carmichael and Mr. Sawyer may recover the costs of this appeal.

AFFIRMED in part;
REVERSED and REMANDED in part