# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2400

JOHN TEBBENS,

*Plaintiff-Appellant*,

*v.*

DENNIS MUSHOL, Officer,
Star No. 8246, et al.,

*Defendants-Appellee*s.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-03227—**Blanche M. Manning,** *Judge.*

ARGUED FEBRUARY 16, 2012—DECIDED AUGUST 30, 2012

Before POSNER, RIPPLE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* John Tebbens brought this
action under 42 U.S.C. § 1983 in the United States
District Court for the Northern District of Illinois,[1]

---

[1] The district court had jurisdiction over the federal claim
under 28 U.S.C. §§ 1331 and 1343(a)(3). It had jurisdiction
over the state claim under 28 U.S.C. § 1367(a).

alleging that Chicago Police Officer Dennis Mushol arrested him without probable cause in violation of his Fourth Amendment rights. He sought indemnification against the City of Chicago under state law. The district court granted summary judgment in favor of the defendants. It concluded that Officer Mushol had probable cause to arrest Mr. Tebbens for violating the terms of his court-ordered supervision. The court further concluded that, even if probable cause did not exist, Officer Mushol nevertheless was entitled to qualified immunity because a reasonable officer could have believed that there was probable cause to arrest Mr. Tebbens for violating the supervision order. Mr. Tebbens timely appealed,[2] and we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Each party presents a drastically different version of the facts. We therefore note, at the outset, that, although we also recount Officer Mushol's testimony with respect to each of his encounters with Mr. Tebbens, we must view the facts in the light most favorable to the nonmoving party, Mr. Tebbens. *See Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992).

---

[2] We have jurisdiction under 28 U.S.C. § 1291.

In 2002, Mr. Tebbens, then a Chicago city firefighter, started a not-for-profit charitable organization called "Helping Children of Abuse."[3] Mr. Tebbens left his position as a firefighter in 2004, but continued his work with the charity. In order to raise money for the charity, Mr. Tebbens solicited donations from motorists by standing on a Chicago street corner and collecting money with a yellow and black rubber boot.[4] During his time as a city firefighter, Mr. Tebbens often had participated in soliciting money for charities in a similar fashion, using a firefighter's black boot as the collection container. He found that the boot provided an efficient method for collecting donations because paper money did not blow away, and it was easier for passersby to give change because the coins always fell to the bottom. He therefore chose to use the same method when he began collecting money for his own charity.

In October 2005, Officer Mushol and his partner, Officer Michael Delahanty, received a radio call that a man was soliciting money with a firefighter's boot at the intersection of Lincoln, Belmont and Ashland Avenues in Chicago. When he arrived at the intersection, Officer Mushol, who was aware of the firefighters' long-

---

[3] The name of the organization subsequently has been changed to "Helping Children."

[4] The boot was approximately twenty to twenty-one inches tall. On it was taped a piece of paper, eight and one-half by eleven inches, with "Helping Children of Abuse" printed on it.

standing practice of collecting charitable donations using their boots, saw Mr. Tebbens soliciting donations with what he believed to be a firefighter's boot. Officer Mushol approached Mr. Tebbens and asked him to produce identification.

Mr. Tebbens testified at his deposition that he initially provided Officer Mushol with his Illinois driver's license as identification. He contends that Officer Mushol then requested that he hand over his wallet, in which Officer Mushol discovered what the officer mistakenly believed to be a firefighter's identification card.[5] Mr. Tebbens then explained to Officer Mushol that he had resigned his position as a firefighter and that the plastic card that Officer Mushol had removed from his wallet, which included a picture and an identification number, was a souvenir that had been given to him by the fire department personnel office.

Officer Mushol called dispatch in an attempt to verify the information given to him by Mr. Tebbens. Upon providing the Chicago Fire Department ("CFD") identification number that was on the card, he was told that the computer system did not return any information corresponding to the number on the card. Because Officer Mushol was unable to verify Mr. Tebbens's status with the fire department at that time, he filled out

---

[5] By contrast, Officer Mushol testified that Mr. Tebbens voluntarily produced a firefighter's identification card and told Officer Mushol that he was a former firefighter who had been injured in the line of duty. R.62-5 at 4 (Mushol Dep. 8).

a contact card to record his encounter with Mr. Tebbens, on which he included Mr. Tebbens's driver's license number and the information printed on the CFD identification card.

Approximately one week later, Officer Mushol called the Office of Emergency Management Communications ("OEMC") to inquire about the identification card. The individual with whom he spoke verified that Mr. Tebbens was neither with the fire department nor on disability. The OEMC employee also told Officer Mushol that, although the CFD records were unclear, it appeared that Mr. Tebbens had been fired by the fire department.

At the direction of the OEMC, Officer Mushol contacted an investigator in the CFD Internal Affairs Division, who verified that Mr. Tebbens was not permitted to possess an active firefighter identification card. The investigator also informed Officer Mushol that the CFD's records showed that Mr. Tebbens had reported a lost identification card while he was still employed with the CFD. In addition, the investigator told Officer Mushol that the Internal Affairs Division would cooperate in any prosecution of Mr. Tebbens with respect to his possession of the identification card.

On April 1, 2006, Officer Mushol again saw Mr. Tebbens soliciting funds for his charity with a large yellow and black boot at the intersection of Lincoln, Belmont and Ashland Avenues. According to Mr. Tebbens, after Officer Mushol and his partner, who were in a police wagon, motioned for him to come towards them, the

two officers "came out" and "rushed over, grabbed each one of [his] arms and elbows, and pushed [him] into the back of the paddy wagon."[6] Mr. Tebbens further testified that neither Officer Mushol nor his partner asked him any questions or requested that he produce identification, but instead referred to him as "un[-]American" and made comments suggesting that he was "collecting money for terrorists."[7]

Mr. Tebbens was taken to the police station and ultimately was charged with theft related to the firefighter identification card. Officer Mushol also issued Mr. Tebbens two tickets, one for not having a valid city permit to solicit funds on behalf of his charity and one for failing to display a city permit, both of which eventually were dismissed.[8]

On June 9, 2006, Mr. Tebbens appeared for a hearing on the theft charge. According to his deposition testimony, a representative from the fire department

---

[6] R.62-3 at 10 (Tebbens Dep. 88).

[7] *Id.* (Tebbens Dep. 89). Officer Mushol maintains that he asked Mr. Tebbens for identification and that Mr. Tebbens once again produced the fire department identification card. R.62-5 at 8 (Mushol Dep. 28).

[8] Mr. Tebbens contends that, at the time of his arrest, he was displaying a valid city permit on his vest. R.62-3 at 12 (Tebbens Dep. 99). The defendants now admit that, at all relevant times, Mr. Tebbens indeed had valid permits to solicit donations on behalf of his charity, issued by the City of Chicago.

appeared at the hearing and stated that the card was not a CFD identification card. Mr. Tebbens further testified that, when the prosecutors indicated that they would dismiss the theft charge, Officer Mushol "was outraged and became red in the face," insisting that Mr. Tebbens be charged with a crime.[9] According to Mr. Tebbens, in light of this development, the charge was not dismissed, and he agreed to an order of supervision.

According to the terms of the supervision order, Mr. Tebbens was prohibited from "hold[ing] himself out as a member of the [CFD] and . . . collect[ing] money/donations on the street with a fireman's (or one similar) boot in the name of the Chicago Fire Dept."[10] Mr. Tebbens testified at his deposition that he initially did not want to agree to the conditions restricting his ability to solicit with a boot similar to a firefighter's boot "because that is what the collection container looks like for Helping Children."[11] However, he eventually agreed to the terms of supervision after his attorney explained to him that, given the way the order was written, he "would have to be doing all three of th[o]se things"— (1) holding himself out as a member of the fire department, (2) collecting money using a boot similar to a firefighter's boot and (3) soliciting money in the name

---

[9] *Id.* (Tebbens Dep. 100).

[10] R.62-6 at 2.

[11] R.62-3 at 13 (Tebbens Dep. 102) (internal quotation marks omitted).

of the CFD—"at the same time" in order to violate the terms of the order.[12]

On May 30, 2007, Mr. Tebbens again was soliciting funds at the same intersection, using a large boot, when Officer Mushol pulled up in his police car. Officer Mushol testified at his deposition that he approached Mr. Tebbens because he was "pretty certain"[13] that Mr. Tebbens was in violation of the order of supervision, and he believed that he had the authority to arrest Mr. Tebbens for such a violation. Although Officer Mushol admitted that he did not know whether Mr. Tebbens was telling people on the street that he was a firefighter, he maintained that, by using the boot, Mr. Tebbens was setting it up for people "to draw their own conclusions" that he was a firefighter.[14]

Officer Mushol approached Mr. Tebbens on foot and signaled Mr. Tebbens to come towards him. According to Mr. Tebbens, Officer Mushol began making disparaging remarks about him and his father, who also had been a firefighter. During the course of the conversation, Mr. Tebbens told Officer Mushol that, based upon his conversations with the prosecutor, he was doing nothing wrong as long as he did not hold himself out as a firefighter or solicit money on behalf of the fire department. Mr. Tebbens also claims that Officer Mushol

---

[12] *Id.* (Tebbens Dep. 103) (internal quotation marks omitted).

[13] R.62-5 at 11 (Mushol Dep. 51).

[14] *Id*. (Mushol Dep. 52).

said that he did not know how Mr. Tebbens avoided the earlier charges, but that "he was going to make them stick this time" because he was "going to say that [Mr. Tebbens] hit [him]."[15] Mr. Tebbens yelled to a group of bystanders waiting at a nearby bus stop to call the police because "a police officer . . . [wa]s threatening an innocent person" and because Officer Mushol was going to say that Mr. Tebbens hit him.[16]

Officer Mushol testified at his deposition that he wanted Mr. Tebbens to accompany him to the police station because he believed that Mr. Tebbens was in violation of his supervision order and because he wanted to see if Mr. Tebbens could be charged with the violation.[17] Officer Mushol further testified that, as he was explaining to Mr. Tebbens that it was his intention to arrest him and put him in the back seat of the police car, he began to do a protective patdown.[18] Mr. Tebbens

---

[15] R.62-3 at 16 (Tebbens Dep. 124) (internal quotation marks omitted).

[16] *Id.* (internal quotation marks omitted).

[17] R.62-5 at 12 (Mushol Dep. 54).

[18] *Id.* (Mushol Dep. 56). Notably, Officer Mushol's testimony at the hearing on the Motion to Quash Arrest and Suppress Evidence regarding the May 30, 2007 encounter is inconsistent with his deposition testimony. At the hearing, Officer Mushol stated that Mr. Tebbens began calling him names, leading him to conduct a protective patdown for his own safety, given the nature of his prior encounters with Mr. Tebbens. *See* R.66-2 at 7-

(continued...)

testified that Officer Mushol grabbed him by the arm with one hand and tried to reach around to his back pocket with the other hand.[19] Mr. Tebbens told Officer Mushol, "You can't search me," and backed away.[20]

Officer Mushol radioed for assistance and, within moments, several officers arrived on the scene. Mr. Tebbens testified that, when the additional officers arrived, they "grabb[ed] [Mr. Tebbens], and it was like—like a cartoon where they were all just around

---

[18] (...continued)

8. He further testified that, at the time he conducted the patdown of Mr. Tebbens, Mr. Tebbens was not under arrest. *Id.* at 12. He explained that Mr. Tebbens was not under arrest until he resisted the patdown by shoving Officer Mushol and backing away from him. *Id.* By contrast, Officer Mushol testified at his deposition that, from the outset, he intended to "bring [Mr. Tebbens] into the station." R.62-5 at 12 (Mushol Dep. 54). He further testified at his deposition that, before Mr. Tebbens allegedly "sharply turned" and "shove[d him] in the chest," he informed Mr. Tebbens that he was going to arrest him and that he was going to conduct a patdown. *Id.* (Mushol Dep. 56). As we explain *infra* at pages 14 to 16 and note 26, these differences are largely irrelevant.

[19] R.62-3 at 16 (Tebbens Dep. 125).

[20] *Id.* (internal quotation marks omitted). According to Officer Mushol, Mr. Tebbens then shoved him in the chest, R.62-5 at 12 (Mushol Dep. 56)—a point that Mr. Tebbens denies.

[him] and bumping, and it was just all elbows."[21] He explained that he "was trying to keep [his] ground and listen to what the [bus driver] was saying and thinking that [he] wasn't going to get arrested because a whole busload of people was saying [he] didn't do anything."[22] Mr. Tebbens also testified that, as the officers were trying to move him along into the police wagon, he "was resisting the movement by just being—just with [his] legs, not trying to get pushed by these people," at which point, "somebody hit [him] with a baton in the thigh and just disabled [him]."[23] According to Mr. Tebbens's testimony, the officers then "grabbed" him and "shoved" him into the van.[24]

Mr. Tebbens was taken to the police station and charged with two counts of aggravated battery/harm to a peace officer, two counts of false impersonation of a firefighter and one count of possession of a fictitious license. The charges eventually were dropped after Mr. Tebbens successfully moved to quash his arrest.

---

[21] R.62-3 at 16 (Tebbens Dep. 125).

[22] *Id.* at 16-17 (Tebbens Dep. 125-26).

[23] *Id.* at 17 (Tebbens Dep. 126).

[24] *Id.* Officer Mushol maintains that he did not participate in restraining Mr. Tebbens or placing him in the police wagon. R.62-5 at 13-14 (Mushol Dep. 61-63). He testified that he watched as the other officers apprehended Mr. Tebbens and placed him in the police wagon and that he did not see any of the officers hit Mr. Tebbens with a baton or any other object. *Id.* at 14 (Mushol Dep. 63).

**B. District Court Proceedings**

Mr. Tebbens filed this lawsuit against Officer Mushol, seeking recovery under 42 U.S.C. § 1983 for false arrest in violation of the Fourth Amendment. He also sought indemnification against the City of Chicago under state law. The defendants moved for summary judgment, and the district court granted the defendants' motion, ruling that Officer Mushol had probable cause to arrest Mr. Tebbens for violating the terms of his court-ordered supervision. The court also concluded, in the alternative, that, even if probable cause did not exist, Officer Mushol was entitled to qualified immunity because a reasonable officer could have believed, albeit mistakenly, that there was probable cause to arrest Mr. Tebbens for violating the court order.[25] Mr. Tebbens now appeals.

## II

## DISCUSSION

**A. Standard of Review**

We review a district court's decision to grant a motion for summary judgment de novo, construing all the facts in the light most favorable to Mr. Tebbens as the nonmoving party. *See Goodman v. Nat'l Sec. Agency, Inc.,*

---

[25] Because the district court granted summary judgment in favor of Officer Mushol on the § 1983 claim, it also entered judgment in favor of the City of Chicago with respect to the state law indemnification claim.

621 F.3d 651, 653 (7th Cir. 2010). Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## B. False Arrest

The record in this case is fraught with ambiguities. Fairly read, however, the amended complaint, in conjunction with the plaintiff's briefs, makes clear that Mr. Tebbens primarily contends that his arrest was illegal because Officer Mushol knew that he lacked probable cause for the arrest. Mr. Tebbens maintains that Officer Mushol therefore intentionally manufactured a situation that would lead to an arrest based upon a false allegation that Mr. Tebbens shoved him.

"Probable cause to arrest is an absolute defense to any claim against police officers under § 1983 for wrongful arrest, even where the defendant officers allegedly acted upon a malicious motive." *Wagner v. Washington Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007) (per curiam). Whether Officer Mushol had probable cause depends on the facts known to him at the time of arrest. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *see also Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010). Therefore, before we turn to the probable cause inquiry, we must determine when the arrest took place.

An arrest occurs "when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the

degree which the law associates with formal arrest."
*Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003) (internal
quotation marks omitted). Therefore, the subjective
intent of both Officer Mushol and Mr. Tebbens is
irrelevant to our inquiry into the nature of Mr. Tebbens's
detention. *Cf. Whren v. United States*, 517 U.S. 806, 813
(1996) ("Subjective intentions play no role in ordinary,
probable-cause Fourth Amendment analysis.").[26] We
may consider, however, facts known to the parties at
the time, and we therefore turn to the facts surrounding
Mr. Tebbens's encounter with Officer Mushol on May 30,
2007, as recounted in Mr. Tebbens's deposition testimony.

  Mr. Tebbens's deposition testimony, fairly read, sup-
ports the conclusion that a reasonable person under
the circumstances would have understood his freedom
to be so constrained that he was under arrest. Of vital
importance to our analysis is Mr. Tebbens's statement
that, prior to placing his hands on Mr. Tebbens,

---

[26] Because our inquiry into the nature of the detention is
governed by an objective standard, we need not consider
Mr. Tebbens's argument that Officer Mushol testified at the
hearing on the Motion to Quash Arrest and Suppress Evidence
that Mr. Tebbens was not under arrest until he resisted the
protective patdown by shoving Officer Mushol and backing
away from him. *See* R.66-2 at 12. Similarly, Mr. Tebbens's
statement at his deposition that he was "thinking that [he]
wasn't going to get arrested because a whole busload of
people was saying [he] didn't do anything," R.62-3 at 16-17
(Tebbens Dep. 125-26), is also irrelevant to our Fourth Amend-
ment analysis.

Officer Mushol told him that he was "going to make [the charges] stick."[27] According to Mr. Tebbens's testimony, Officer Mushol then informed him that he intended to do so by saying that Mr. Tebbens hit him. *Id.* Mr. Tebbens reiterated this account in his brief, arguing that "the evidence shows that Officer Mushol did not believe he had probable cause to arrest [Mr. Tebbens] for violation of his terms of supervision, but rather intended to make a felony charge against [Mr. Tebbens] 'stick' by falsely accusing [Mr. Tebbens] of striking him."[28] Although Officer Mushol's unstated intentions with respect to his confrontation with Mr. Tebbens may be irrelevant to our analysis, Officer Mushol's statement to Mr. Tebbens—that he was "going to make [the charges] stick"[29]—is certainly a factor to consider in assessing whether a reasonable person in Mr. Tebbens's position would have concluded that he was under arrest. *See United States v. Mendenhall*, 446 U.S. 544, 555 n.6 (1980); *see also Ochana*, 347 F.3d at 270. We believe that Officer Mushol's stated intentions support our conclusion that Mr. Tebbens was aware from the early stages of his encounter with Officer Mushol that the officer intended to charge him with a crime. In addition, we believe that Officer Mushol's subsequent act of placing his hands on Mr. Tebbens, viewed in conjunction with his earlier statements, further conveyed his intent to restrain

[27] R.62-3 at 16 (Tebbens Dep. 124).

[28] Appellant's Br. 19.

[29] R.62-3 at 16 (Tebbens Dep. 124).

Mr. Tebbens's freedom of movement in order to effect an arrest. We therefore conclude that, under the circumstances, a reasonable person would have understood his freedom to be so constrained that he was under arrest at the time Officer Mushol made physical contact with Mr. Tebbens.

We next turn to the question whether the arrest was supported by probable cause. Mr. Tebbens first asserts that the district court erred in concluding that the Illinois statute governing probation and supervised release provides a statutory basis to arrest an individual who allegedly has violated the terms of his supervision. Mr. Tebbens further contends that the Illinois statute governing supervision similarly does not provide such authority. Finally, even if the statute governing supervision could be construed to permit an arrest for violating the terms of supervision, Mr. Tebbens maintains, Officer Mushol did not have probable cause to believe that Mr. Tebbens was violating the terms of his supervision.

We believe that Mr. Tebbens's first contention has merit. The Illinois statute relied upon by the district court, 730 ILCS 110/11, provides that police officers "may, anywhere within the state, arrest on view any probationer found by them violating any of the conditions of his or her probation." For purposes of this provision, probation is more narrowly defined as "a sentence or disposition of conditional and revocable release under the supervision of a probation officer." 730 ILCS 5/5-1-18. It is clear from the record that Mr. Tebbens was not

sentenced to a term of probation or supervised release in connection with the charge of theft of a firefighter's identification card. The district court, therefore, incorrectly relied upon the Illinois probation statute in determining that Officer Mushol had the statutory authority to arrest Mr. Tebbens for violating the terms of his supervision.

The question whether Officer Mushol had the authority to arrest Mr. Tebbens for violating the court order instead must be evaluated under 730 ILCS 5/5-6-4.1, the Illinois statute that governs an alleged violation of supervision. In contrast to probation, for which a sentence is imposed, the Supreme Court of Illinois has explained that supervision is "a disposition of conditional and revocable release without probationary supervision, but under such conditions and reporting requirements as are imposed by the court, at the successful conclusion of which disposition the defendant is discharged and a judgment dismissing the charges is entered." *People v. Bushnell*, 461 N.E.2d 980, 981-82 (Ill. 1984) (internal quotation marks omitted). Supervision is applied "where the court finds the offender is not likely to commit further crimes, the defendant and the public would be best served if the defendant did not receive a criminal record and in the interest of justice supervision is more appropriate than a sentence otherwise provided under [state law]." *Hajawii v. Venture Stores, Inc.*, 465 N.E.2d 573, 575 (Ill. App. Ct. 1984). Supervision is thus intended to provide "a mild disposition without the stigma of a criminal record." *Id.* at 576.

The Illinois supervision statute provides that, upon a motion by the state or the court alleging a violation of a condition of supervision, the court may issue a notice, summons or warrant. *See* 730 ILCS 5/5-6-4.1(a).[30] Here, the defendants acknowledge that there was no petition filed and that Officer Mushol's actions were not

---

[30] The statute provides, in relevant part:

(a) In cases where a defendant was placed upon supervision or conditional discharge for the commission of a petty offense, upon the oral or written motion of the State, or on the court's own motion, which charges that a violation of a condition of that conditional discharge or supervision has occurred, the court may:

(1) Conduct a hearing instanter if the offender is present in court;

(2) Order the issuance by the court clerk of a notice to the offender to be present for a hearing for violation;

(3) Order summons to the offender to be present; or

(4) Order a warrant for the offender's arrest.

The oral motion, if the defendant is present, or the issuance of such warrant, summons or notice shall toll the period of conditional discharge or supervision until the final determination of the charge, and the term of conditional discharge or supervision shall not run until the hearing and disposition of the petition for violation.

730 ILCS 5/5-6-4.1.

in keeping with the procedural measures prescribed by Illinois law.

Contrary to Mr. Tebbens's assertions, however, it is firmly established that the Fourth Amendment permits an officer to make an arrest when he or she has probable cause to believe that an individual has committed or is committing an act which constitutes an offense under state law, *regardless* of whether state law authorizes an arrest for that particular offense. *See Virginia v. Moore*, 553 U.S. 164, 176 (2008); *Thomas v. City of Peoria*, 580 F.3d 633, 638 (7th Cir. 2009). The Fourth Amendment permits an arrest for any conduct constituting a criminal offense, even a minor one, under state law. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). We therefore may limit our inquiry to whether a violation of the terms of court-ordered supervision indeed constitutes an "offense" under state law.

As an initial matter, Mr. Tebbens is correct in his assertion that there is no Illinois statute that provides that a violation of a term of supervision is a crime. The supervision statute provides, however, that upon violation of a condition of supervision a court "may impose any other sentence that was available . . . at the time of initial sentencing." 730 ILCS 5/5-6-4.1(e). In other words, upon a showing that the defendant has violated the terms of supervision, the court may revoke supervision and impose a fine or any other sentence that was available at the time of initial sentencing, including imprisonment. *See City of Urbana v. Andrew N.B.*, 813 N.E.2d 132, 143 (Ill. 2004) ("When a court imposes supervision, it

strikes a deal with the defendant. The judge, in effect, says, 'Abide by the terms of your supervision, or the court will lift the *de facto* continuance and sentence you.'"). Mr. Tebbens initially was charged with, and accepted an order of supervision with respect to, theft. *See* 720 ILCS 5/16-1.[31] As a Class A misdemeanor,[32] theft carries a possible determinate sentence of less than one year and a possible fine of up to $2,500. *See* 730 ILCS 5/5-4.5-55. Consequently, any violation of the terms of Mr. Tebbens's supervision could have resulted in a fine or imprisonment for less than one year. "[C]onduct for which a sentence to a term of imprisonment or to a fine is provided by any law of this State" is an "offense" for purposes of the Illinois sentencing statutes. *See* 730 ILCS 5/5-1-15.[33] Consequently, Mr. Tebbens's violation of the

---

[31] Mr. Tebbens admits that he was charged with "theft," *see* R.65 at 4; neither party, however, identifies the applicable theft provision of the Illinois code.

[32] There are several gradations of "theft" under the Illinois code. *See* 720 ILCS 5/16-1. "Theft of property not from the person and not exceeding $500 in value is a Class A Misdemeanor." *Id.* 5/16-1(b)(1). "Theft . . . of governmental property" not exceeding $500 is a Class 4 felony. *See id.* 5/16-1(b)(1.1). Again, the parties do not specify the subsection that provided the basis for Mr. Tebbens's charge. We therefore employ the least serious violation of the theft provision for purposes of our analysis.

[33] Moreover, as noted above, the underlying offense—theft—fits squarely within the definition of "offense" under the Illinois

(continued...)

terms of his supervision would qualify as an "offense" under this definition.

Additionally, we note that the fact that state law authorizes an arrest for a violation of supervision, even if only on a warrant, further supports our conclusion that conduct in violation of a supervision order, issued in lieu of sentencing on criminal charges, constitutes an offense under state law.

Having concluded that Officer Mushol had the authority to arrest Mr. Tebbens for violating the terms of his supervision, we next must consider whether Officer Mushol had probable cause to believe that Mr. Tebbens was in violation of the court order. In assessing the record before us, we must examine Officer Mushol's actions objectively—not in terms of his state of mind. *See, e.g.*, *Whren*, 517 U.S. at 812-13. The reasonableness of Officer Mushol's actions does not depend on his subjective motivations. *See Simmons v. Pryor*, 26 F.3d 650, 654 (7th Cir. 1993). Rather, the existence of probable cause depends on whether the "'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan v. DeFillippo*,

---

[33] (...continued)

criminal code. *See* 720 ILCS 5/2-12 ("'Offense' means a violation of any penal statute of this State.").

443 U.S. 31, 37 (1979)) (alteration in original). Therefore, in evaluating whether Officer Mushol had probable cause, we "must consider the facts as they would have reasonably appeared to [Officer Mushol] seeing what he saw, hearing what he heard at the time of the incident." *Driebel v. City of Milwaukee*, 298 F.3d 622, 643 (7th Cir. 2002) (internal quotation marks omitted).

Here, it is undisputed that Officer Mushol was aware that, as a result of his prior arrest of Mr. Tebbens for theft of the firefighter's identification card in April 2006, the court had issued an order of supervision, imposing certain restrictions on Mr. Tebbens's ability to solicit donations on behalf of his charity. On May 30, 2007, Officer Mushol again saw Mr. Tebbens soliciting donations using a boot similar to a firefighter's boot. In other words, Officer Mushol saw Mr. Tebbens engaging in the same activity that he had been engaging in a year earlier when Officer Mushol had arrested him for theft.

We have observed in prior cases that "[p]robable cause requires only that a probability or a substantial chance of criminal activity exist." *Purvis v. Oest*, 614 F.3d 713, 722-23 (7th Cir. 2010). The evidence of record, therefore, need not establish that Officer Mushol's belief that Mr. Tebbens was in violation of the court order was "more likely true than false." *Id.* at 723. Here, to be sure, the language of the supervision order lacks precision. It does not speak in concrete terms as to what actions constitute holding oneself out as a member of the Chicago Fire Department or soliciting in the name of the Department. Indeed, Mr. Tebbens testified at his

deposition that he initially did not want to agree to the conditions of supervision because he believed *it would restrict his ability to solicit with a boot similar to a firefighter's boot*.[34] According to Mr. Tebbens, he only agreed to the terms of supervision after his attorney reassured him that, given the way the order was written, he "would have to be doing all three of th[o]se things"—holding himself out as a member of the fire department, collecting money using a boot similar to a firefighter's boot and soliciting money in the name of the CFD—"at the same time" in order to violate the terms of the order.[35] Nevertheless, we believe that a reasonably prudent person could have read the supervision order without the nuances suggested by Mr. Tebbens's attorney.

Even assuming, however, that probable cause did not exist to arrest Mr. Tebbens, Officer Mushol nevertheless is entitled to qualified immunity. We recently have reiterated that "[t]he question of whether [an officer] had probable cause to arrest . . . is separate from the question relating to qualified immunity." *Fleming v. Livingston Cnty.*, 674 F.3d 874, 879 (7th Cir. 2012). Qualified immunity protects officers who are "reasonable, even if mistaken" in making probable cause assessments. *See Hunter v. Bryant*, 502 U.S. 224, 229 (1991). It shields public servants from "liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known." *Fleming*, 674 F.3d at 879 (internal

---

[34] *See* R.62-3 at 13 (Tebbens Dep. 102-03).

[35] *Id.* (Tebbens Dep. 103).

quotation marks omitted). In determining whether a right is "clearly established," "we must look at the right violated in a 'particularized' sense, rather than 'at a high level of generality.'" *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). We particularly are concerned that "[t]he official . . . have fair warning that his conduct is unconstitutional." *Id.* at 859 (internal quotation marks omitted). In the context of a Fourth Amendment claim based on lack of probable cause, we have stated that an officer is entitled to qualified immunity "when a reasonable police officer in the same circumstances . . . and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Fleming*, 674 F.3d at 880 (emphasis in original) (internal quotation marks omitted).

Here, determining whether probable cause existed involved the interpretation of Mr. Tebbens's supervision order. The order stated that Mr. Tebbens was prohibited from "hold[ing] himself out" as a member of the CFD and soliciting "in the name of" the CFD.[36] Officer Mushol interpreted this to mean that Mr. Tebbens was not permitted to solicit donations "in any[ ]way with any type of equipment that might resemble or lead people to believe that he might be a firefighter."[37] We believe that Officer Mushol's interpretation is not

---

[36] R.62-6 at 2.

[37] R.66-2 at 10.

unreasonable under the circumstances. When Officer Mushol encountered Mr. Tebbens on May 30, he was engaged in the same activity—soliciting funds at an intersection using a boot that bore a close resemblance to a firefighter's boot—that led to the conditions of Mr. Tebbens's order of supervision following his original arrest. Moreover, Mr. Tebbens's initial understanding of the supervision order, prior to consultation with counsel, was that it would prohibit him from using a boot to solicit funds for his charity. We do not believe we should fault Officer Mushol for interpreting the order in the same manner as Mr. Tebbens did and the way a reasonable officer could have.

Indeed, we have held that an officer who makes an arrest based on a reasonable understanding of a court order is entitled to qualified immunity. *See, e.g.*, *Wagner v. Washington Cnty.*, 493 F.3d 833 (7th Cir. 2007). In *Wagner*, a harassment injunction required the plaintiff to "'avoid . . . any premises temporarily occupied by [specific individuals].'" *Id.* at 837 (first alteration in original). The plaintiff was attending a meeting at the town hall when the individuals with whom he was prohibited from having contact arrived. Those individuals contacted the local police, who requested that the plaintiff leave the premises. When he refused, he was arrested. The plaintiff later brought a § 1983 action against the officers for, *inter alia*, arresting him without probable cause. We concluded that, although the defendant deputies did not have probable cause to arrest the plaintiff for violating the terms of his harassment injunction, they nonetheless were entitled to

qualified immunity. *Id.* We explained that, "[e]xamining the facts, not as an omniscient observer would perceive them but as they would have appeared to a reasonable person in the position of the arresting officers," we could "understand how the deputies could believe that [the plaintiff] was violating a harassment injunction that required him to 'avoid . . . any premises temporarily occupied' by [specific individuals] when he remained in the town hall after the [specific individuals] arrived." *Id.* (third alteration in original).

Similarly, as detailed previously, the record here is replete with evidence that Officer Mushol had a factual basis for believing that Mr. Tebbens was in violation of the terms of his supervision. Given the imprecise language of the order, Mr. Tebbens's own reasonable interpretation of the order, and Officer Mushol's prior observations of Mr. Tebbens, we believe that Officer Mushol reasonably could conclude that, in soliciting funds on the intersection using a large rubber boot, Mr. Tebbens was holding himself out as a firefighter and soliciting on behalf of the Chicago Fire Department.

"[T]he qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). On the record before us, we cannot say that Officer Mushol's May 30 arrest of Mr. Tebbens placed

him in either category. We therefore conclude that Officer Mushol is entitled to qualified immunity.[38]

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

---

[38] Given our conclusion that Officer Mushol had probable cause to arrest Mr. Tebbens for violating the terms of his supervision, we need not address the defendants' argument that, because Mr. Tebbens resisted Officer Mushol's efforts to effect an arrest, there was probable cause to arrest him for resisting a peace officer, in violation of 720 ILCS 5/31-1(a).

Furthermore, because the argument was not raised by the defendants, we have no occasion to consider whether Officer Mushol's actions leading to the arrest could be considered an investigatory stop or whether Mr. Tebbens's efforts to avoid these actions would violate 720 ILCS 5/31-1(a).