**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-4664**

UNITED STATES OF AMERICA,

　　　　　　Plaintiff - Appellee,

　　　v.

RANDALL JUSTIN MCGEE,

　　　　　　Defendant - Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Thomas E. Johnston, District Judge. (2:11-cr-00191-1)

Argued: September 20, 2013　　　Decided: November 18, 2013

Before DAVIS, KEENAN, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Keenan and Judge Floyd joined.

**ARGUED**: Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. Monica D. Coleman, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF**: Mary Lou Newberger, Federal Public Defender, Lex A. Coleman, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. R. Booth Goodwin II, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

DAVIS, Circuit Judge:

Randall Justin McGee was convicted in the Southern District of West Virginia of possession with intent to distribute oxycodone, in violation of 21 U.S.C. § 841(a)(1), and sentenced to fifty-five months of imprisonment. On appeal, McGee challenges the district court's denial of his motion to suppress drugs seized during a traffic stop. He also challenges his sentence on two grounds: Whether the district court (1) committed clear error in finding that a seizure of cash from McGee occurring approximately two weeks before his arrest arose from "relevant conduct" to the offense of conviction (and thereby increased his sentencing range); and (2) committed procedural error in failing to impose an individualized sentence. We reject McGee's contentions and affirm the judgment.

I.

A.

Law enforcement officers first encountered McGee on July 10, 2011, when police received a tip that a black male near a Greyhound bus station in Charleston, West Virginia, was acting suspiciously. Officers went to the station and approached the man, later identified as McGee, who agreed to speak with them. When first questioned, McGee said he was not traveling, but had come to the bus station to meet a childhood friend. The officers conducted a search of McGee's person and found a bus ticket in

2

the name of Adam Lowe, for travel between Charleston, West Virginia, and Detroit, Michigan. When the officers discovered that McGee's name did not match the name on the bus ticket, they handcuffed him.

McGee denied that he was in possession of any contraband and consented to a search of his bag. Inside the bag, the police found $5,800 in cash. McGee stated he did not have a job and had not had one for over a year. He claimed he was traveling with $2,000 to see the mother of his child and/or his mother. The police determined that McGee did not have a reasonable explanation for his possession of the cash and seized the money.

Police contacted McGee's mother, who said that McGee did not yet have a child (though his girlfriend was pregnant at the time). She also reported that McGee was in West Virginia "earning money," and that McGee was supposed to bring the money back with him. J.A. 313. Police also seized McGee's cell phone, which had several text messages. One message was from his brother, instructing McGee to have somebody else go into the bus station and buy a ticket using a different name, and to wait in the car while the ticket was purchased. Police believed other texts were "drug-related," such as a text stating, "Are they moving? How many do you have left, and the total should be $6,075.00." Id.

The police released McGee without arresting him.

3

A little more than two weeks later, on July 26, 2011, South Charleston Police Officer Jonathan Halstead, a member of the Metro Drug Unit, stopped a Dodge Avenger on I-77. Halstead stopped the car after observing that the middle brake light (located in the center of the back windshield) was not working properly when the driver braked during a slowdown in traffic. Halstead had the driver, Kardell Moore, get out of the car; Moore volunteered to Halstead that his driver's license was suspended and the car was a rental. Halstead briefly spoke with McGee, then seated in the front passenger seat, in order to ascertain whether McGee had a valid driver's license. Halstead testified at the suppression hearing that McGee was nervous and his hands were shaking. Halstead obtained identifying information from McGee and called for backup. While Halstead was checking McGee's information, Officer David Richardson arrived on the scene.[1]

Halstead told Richardson what he had observed regarding McGee, and Richardson agreed to speak with McGee. Richardson spoke briefly with McGee and asked him to get out of the car. McGee complied, and after exiting the vehicle he consented to a

---

[1] A third officer, Owen Morris, arrived on the scene before Detective Richardson. Morris did not witness the actual stop, and he did not have any interaction with McGee.

search of his person. During the search, Richardson felt items he believed were pills in McGee's shorts. Richardson put McGee in hand restraints, and shook a bag of pills out of McGee's shorts. The bag contained 246 oxycodone pills and 151 oxymorphone pills.

## II.

## A.

McGee was charged with possession with intent to distribute oxycodone, in violation of 21 U.S.C. § 841(a)(1). He filed a motion to suppress the drugs seized during the traffic stop. Specifically, he disputed Halstead's claim that the car had a defective brake light. The court held a hearing, at which the three police officers present at the scene testified. Thereafter, the court issued an opinion denying the motion to suppress, finding that Halstead's testimony was "entirely credible" and that he had probable cause to believe the driver had committed a traffic violation by not having an operational brake light.[2] J.A. 160.

A few weeks later, McGee filed a renewed motion to suppress on the basis of newly obtained evidence. McGee again challenged the validity of the stop, this time proffering evidence

---

[2] It is illegal for a vehicle to have any non-operational brake lights in West Virginia. W. Va. Code § 17C-15-18(b).

resulting from an investigation into the condition of the rental car. That evidence tended to show that all the brake lights in the vehicle were operational in November 2011, and there was no record of a repair after the traffic stop in July 2011.

The court held another hearing on the matter. At the hearing, the court heard further testimony from Halstead; Patrick Kearns, an investigator with the Federal Defender's office; and Jason Tardiff, a risk manager with Enterprise Rent-a-Car. Halstead again testified that he saw the defective brake light prior to the traffic stop. Kearns testified that he found the rental car at Enterprise's car dealership in Kentucky, where he tested the brake lights and found them to be fully functional on November 18, 2011. Tardiff testified that it was customary for Enterprise to keep a record of all complaints and repairs made on any vehicle; there was no record of any complaints about the defective brake light or any repair for a defective brake light after the stop in July 2011.

The court denied McGee's renewed motion to suppress. The court noted that the government was relying exclusively on Halstead's testimony to meet its burden of showing by a preponderance of the evidence that Halstead had probable cause to stop the car. Specifically, the court held that "[a]lthough Defendant's evidence raises a serious factual issue, it is ultimately insufficient to overcome Officer Halstead's direct

6

and unimpeached testimony that the Avenger's center brake light was indeed nonoperational on July 26, 2011." J.A. 264. The court stated that Halstead was "frank and earnest, and his recollection of the events of July 26, 2011, was unwavering." Id. The court pointed to two possible explanations, urged by the government, for the lack of repair and/or record of a repair: a temporary malfunction, such as an electric short, or that there was a repair, but no record of it.

B.

Having denied the motions to suppress, the court conducted a bench trial at which McGee did not contest the government's evidence. McGee only proceeded to trial in order to preserve his right of appeal, and did not feel comfortable accepting certain stipulations proposed by the government in plea negotiations. The court found McGee guilty as charged.

C.

In advance of sentencing, the presentence investigation report ("PSR") laid out the "Offense Conduct," describing the traffic stop and McGee's arrest, but also described the earlier incident at the bus station. In accordance with the Guidelines, the PSR converted the drugs seized from McGee during the traffic stop into a marijuana equivalency. Over McGee's timely objection, the PSR also converted the $5,800 seized from McGee at the bus station, stating the cash "is viewed as representing

7

proceeds of drug distribution," since McGee was later found with the drugs and "he has held no legitimate employment" since 2006. J.A. 353. McGee's base offense level under the Guidelines was 24 based on an equivalency calculation of 98.94 kg of marijuana, including the 19.3 kg added by the cash proceeds equivalent. Without the cash proceeds conversion, McGee's base offense level would have been 22. U.S.S.G. § 2D1.1(c)(9). After the reduction for acceptance of responsibility, the final Guidelines range was 51 to 63 months (including the cash proceeds), instead of 41 to 51 months (without including the cash proceeds).[3]

McGee objected to the inclusion of the drug equivalent for the cash seized at the bus station, arguing that there was no evidence to connect the funds to the July 26, 2011 stop. McGee argued specifically that his possession of a ticket in a different name and his lack of employment were insufficient to support such a finding. McGee pointed out that there were no

---

[3] In the PSR the Probation Officer recommended against an adjustment for acceptance of responsibility, given that McGee had a bench trial. McGee argued that his case falls into an exception noted in the commentary to U.S.S.G. § 3E1.1, as he only went to trial in order to preserve his right of appeal on issues not related to his factual guilt. The government argued that McGee should not be granted the adjustment because his arguments against including the drug equivalent of the cash seized at the bus station amounted to "frivolously denying relevant conduct." J.A. 306. Notably, the court rejected the government's argument and awarded the adjustment.

drugs seized with the money and that McGee was never arrested or charged with anything related to the bus station incident.

The court held a sentencing hearing at which the government explained the bus station incident. McGee accepted the government's factual proffer, acknowledging that there were conflicting statements and suspicious behavior, but maintained that there was no legitimate connection between the seizure of the cash and the traffic stop two weeks later. The court took the matter under advisement and continued the sentencing hearing.

At the continued sentencing hearing, the court determined that the government had met its burden of proof to show that the cash involved relevant conduct. The court noted that it was "a close call" but McGee's conflicting explanations for his presence at the bus station paired "with the fact that just two weeks later, he was caught with a rather large bag of pills . . . not very far at all from that bus station" were enough to meet this burden. J.A. 322-23. The court therefore found a final offense level of 22, a criminal history category of III, and a Guidelines range of 51 to 63 months.

McGee requested a variant sentence of forty-one months, noting that he had strong family support, secured employment following his pre-trial release, was relatively young and just "made a dumb mistake trying to take some shortcuts and passing

9

through this state." J.A. 327. The government contended that McGee intended to distribute the drugs in West Virginia and was not just passing through, pointing out the bus station incident two weeks before the traffic stop.

The court considered the Guidelines and the 18 U.S.C. § 3553(a) factors, and pronounced a sentence of fifty-five months. The court noted that "stiffer sentences for these pill cases are justified because of the seriousness of the offense" and the necessity for deterrence. J.A. 332. The court pointed out that there is "a problem with drugs coming into West Virginia, particularly Southern West Virginia, from Detroit" and that he hoped "that sentences in these cases where I have defendants from Detroit . . . will send a message back to Detroit that the drugs being brought here from Detroit are not welcome and that serious punishments await people who bring drugs here from Detroit." J.A. 331, 332.

McGee objected to the court's decision to use the sentence to "send a message" to Detroit, and denied that there was any evidence of drug trafficking in West Virginia. The court overruled McGee's objections, stating that it was within the parameters of the § 3553(a) factors to consider the source of the drugs. The court acknowledged that "implicit in that sentence and my reasons for the sentence is that this defendant was bringing those pills from Detroit to West Virginia" but that

10

it was reasonable to conclude that the drugs came from Detroit to West Virginia given that was where McGee drove from, and where all of his phone numbers were from. J.A. 337.

McGee filed a timely notice of appeal.

III.

McGee first challenges the district court's denial of his motion to suppress.

We review the factual findings underlying a district court's ruling on a motion to suppress for clear error and its legal conclusions de novo. United States v. Vaughan, 700 F.3d 705, 709 (4th Cir. 2012) (citations omitted). When the district court denies a motion to suppress, we view the evidence in the light most favorable to the government. Id. The government bears the burden of proof in justifying a warrantless search or seizure. Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); United States v. Watson, 703 F.3d 684, 689 (4th Cir. 2013).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809–10 (1996). "Because an ordinary traffic stop

11

is 'a limited seizure more like an investigative detention than a custodial arrest,' we employ the Supreme Court's analysis for investigative detention used in Terry v. Ohio, 392 U.S. 1 (1968), to determine the limits of police conduct in routine traffic stops." United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011) (quoting United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992)). Detention of passengers during a traffic stop provides the basis for them to challenge the legality of the stop under the Fourth Amendment. Brendlin v. California, 551 U.S. 249, 256-63 (2007).

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). The parties agree that a non-functioning brake light is a violation of the law in West Virginia. See W. Va. Code § 17C-15-18(b). The government relies on Halstead's testimony describing the non-operative brake light, which the district court found "frank and earnest"; the officer's memory was "unwavering." J.A. 264. McGee argues that this testimony is uncorroborated and fatally undermined by the testimony from Investigator Kearns and Enterprise's Tardiff that the brake lights were fully functional when Kearns tested them

12

in November 2011 and there were no repairs made between July 2011 (the time of the stop) and November 2011.

McGee seeks support from United States v. Ellington, 396 F. Supp. 2d 695, 700-01 (E.D. Va. 2005), and Carmichael v. Village of Palatine, 605 F.3d 451, 455 (7th Cir. 2010). In reliance on those cases, he contends that where it is only an officer's testimony against subsequent evidence of operative brake lights, the court must find that there is insufficient evidence of a non-operative brake light. Even apart from the fact that these cases are not binding authority on us, McGee reads far too much into them. In both Ellington and Carmichael, police officers cited a non-operative brake light as the reason for a traffic stop, Ellington, 396 F. Supp. 2d at 700; Carmichael, 605 F.3d at 455, but in each, the suppression hearing judge made findings materially unlike those made in the case at bar.

In Ellington, there was testimony from the defendant's father, who took possession of the car immediately after the stop, and of a vehicle mechanic, each of whom attested that all the brake lights were functional. See 396 F. Supp. 2d at 700. Ultimately, the court found that the officers had made an unreasonable mistake in concluding that the brake light was inoperative. Id. at 701 ("[T]he standard is not whether the brake light was actually non-functioning, but rather whether the officers made a reasonable mistake in believing that the center

13

brake light was non-functioning[;] the Court must ask whether the government has demonstrated by a preponderance of the evidence that the officer's mistake was reasonable. The Court finds that the government has failed to surmount that burden."). The failure of the government to satisfy its burden of proof in the circumstances of that case, therefore, has no relevance to whether it did so on the facts here.

Carmichael is similarly unavailing to McGee. There, as is frequently the case, the outcome of the suppression ruling hinged entirely on witness credibility. Specifically, the police officer conducting the stop told the individuals in the car that he had pulled the car over because the car windows were tinted, and the car did not have a front license plate, but he later testified that he had observed inoperative tail and brake lights. Carmichael, 605 F.3d at 454-55. The hearing judge made a specific finding that the officer "out and out lied" under oath regarding the brake light malfunction. Id. at 455.

This case, too, turns on credibility, but cuts the other way, as the district court found the government satisfied its burden. We "defer to a district court's credibility determinations, for 'it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress.'" United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008) (quoting United States v. Murray, 65 F.3d

14

1161, 1169 (4th Cir. 1995)). This does not mean, of course, that "a trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness." Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). For instance, "[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." Id.

The issue presented here is whether the district court committed clear error in making the finding that it did, in the manner that it did. Vaughan, 700 F.3d at 709. Although McGee's evidence that the brake light was not inoperative is significant, it is nonetheless circumstantial and relies on the untested reliability of a third party's recordkeeping. In short, the defense evidence falls short of establishing clear error by the district court. Even if we might have reached a different determination if presented with the same evidence in the first instance, we cannot say that it was clear error for the district court to rule as it did. Accordingly, we do not disturb the district court's ruling on the motion to suppress.

IV.

We turn now to McGee's challenge to the procedural reasonableness of his sentence. We review a sentence for

15

procedural reasonableness using the abuse-of-discretion standard. United States v. Lynn, 592 F.3d 572, 575 (4th Cir. 2010). In analyzing procedural reasonableness, we first determine whether the district court correctly calculated the advisory Guidelines range. Id. "The government bears the burden of proving the facts necessary to establish the applicability of [a sentencing] enhancement by the preponderance of the evidence." United States v. Garnett, 243 F.3d 824, 828 (4th Cir. 2001). We "review factual findings for clear error, and legal conclusions de novo." United States v. Davis, 679 F.3d 177, 182 (4th Cir. 2012).

A.

McGee first challenges his sentence on the ground that the district court erred in including the drug equivalent of the cash seized from him weeks before his arrest in its calculation of his Guidelines range. We discern no error in the court's finding.

The base offense level in drug distribution cases is determined on the basis of the quantity of drugs. United States v. Pauley, 289 F.3d 254, 258 (4th Cir. 2002). The government must prove by a preponderance of the evidence the quantity of drugs for which a defendant is responsible. United States v. Bell, 667 F.3d 431, 441 (4th Cir. 2012). Where police seize cash and not drugs from a defendant, the cash can be converted

16

to a quantity of drugs consistent with the normal selling price for the drugs. United States v. Sampson, 140 F.3d 585, 592 (4th Cir. 1998).

McGee does not contest the quantity of drugs seized during the traffic stop, only the addition of the drug equivalent from the cash seized at the bus station. Under the Guidelines, conduct which is in the "same course of conduct or common scheme or plan as the offense of conviction" can be considered in the calculation of the base offense level. U.S.S.G. § 1B1.3(a)(2). Acts are in the "same course of conduct" if

> they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

U.S.S.G. § 1B1.3 cmt. 9(b).

McGee maintains that the government did not meet its burden, as the only evidence that McGee's presence at the bus station was related to drug trafficking was: first, that McGee gave several inconsistent stories for why he was in Charleston at the bus station, and second, that McGee had text messages on his phone which the police interpreted as relating to drugs.

17

McGee points out that there were no drugs found on him at the bus station, and that none of the text messages actually stated anything about "pills" or other drugs. The government contends it was not clear error for the court to credit these two factors as sufficient to find that McGee's actions at the bus station were a part of the "same course of conduct" involving the pills on his person at the traffic stop.

McGee's arguments fail. The police interacted with McGee twice, both times in places of interstate transportation (once a bus station, and the other on an interstate highway); once seizing a substantial amount of cash, and the other a significant quantity of drugs ready for distribution. McGee could not provide a consistent explanation for why he had that much cash on him when the police interviewed him at the bus station. This, combined with his suspicious behavior in having a ticket under someone else's name and text messages which were consistent with a drug trafficking scheme, is enough to make it more likely than not that McGee was transporting drug proceeds in the same series of actions as that which he was actually charged with when he was found in possession of the pills.

The district court did not err in finding that the two incidents comprised the same course of conduct or in adding the drug equivalent of the cash seized when it calculated the drug quantity that drove the calculation of McGee's sentencing range.

18

Finally, McGee challenges his sentence on the ground that the district court erred in failing to afford him an individualized assessment in arriving at his sentence. <u>Gall v. United States</u>, 552 U.S. 38, 50 (2007) (sentencing court "must make an individualized assessment based on the facts presented"); <u>United States v. Carter</u>, 564 F.3d 325, 328 (4th Cir. 2009). McGee complains that the district court simply put him in a class of people who brought drugs from Detroit and sentenced him on that basis, pointing to the court's emphasis on using the sentence to "send a message" to offenders in Detroit. J.A. 332.

Here, the district court offered a sufficiently individualized rationale for its sentence, without undue emphasis on McGee's status as a nonresident importer of drugs into the district. In addition to the statements about Detroit, the court made numerous references to McGee's criminal history, the nature of the offense, and the need for deterrence. The district court also specifically denied McGee's request for a variant sentence of forty-one months with an articulable justification. We therefore find little merit in McGee's challenge.

Deterrence is a goal a sentencing court must take into consideration. 18 U.S.C. § 3553(a)(2)(B) ("the need for the

19

sentence imposed . . . to afford adequate deterrence to criminal conduct"); see, e.g., United States v. Montes-Pineda, 445 F.3d 375, 381 (4th Cir. 2006). The court's belief that McGee, in particular, needed to be deterred, as well as others similarly situated, unquestionably was a valid consideration. Contrary to McGee's arguments, the court's desire to send a message was not just about the connection between McGee and Detroit, it was also about McGee's own criminal history. The court stated that "[W]hat's clear to me is that your prior contacts with the criminal justice system, including the sentences you were given, did not deter you from engaging in this activity. So it's clear that you need a stiffer penalty to get the message." J.A. 332.

We pause to note that, viewed in isolation, some of the district court's comments evince a perilously close flirtation with the line we drew in United States v. Diamond, 561 F.2d 557 (4th Cir. 1977)(per curiam). In that case, the district court sentenced two defendants convicted of stealing interstate shipments of cigarettes and, in doing so, noted that "the Court takes a dim view of people coming down from New York to commit their crimes in Virginia." Id. at 559. Although we affirmed the convictions, we vacated the sentences and remanded for resentencing before a different district judge, holding:

> The inference that the district judge considered as a
> factor in sentencing the fact that defendants who
> committed a crime within the district in which he

20

presided were nonresidents is inescapable. We cannot permit a district judge who is an officer of a national judicial system and who is enforcing a national criminal code to be moved by such considerations of parochialism in imposing sentences.

Id.

In fashioning the sentence in the case at bar the district court relied in part on the fact that McGee brought narcotics from out of state, and specifically from Detroit, Michigan. The court stated:

> Finally, it is, as [the prosecutor] indicates, no secret that there is a problem with drugs coming into West Virginia, particularly Southern West Virginia, from Detroit. I don't know why that is, because there are other cities that are closer to West Virginia that we see much less drugs coming from, but for some reason, people from Detroit seem to look at West Virginia as a drug market for them to bring their drugs to.
>
> . . . .
>
> I, in particular, hope that sentences in these cases where I have defendants from Detroit, and you're by no means the first defendant I have had from Detroit, will send a message back to Detroit that the drugs being brought here from Detroit are not welcome and that serious punishments await people who bring drugs here from Detroit.

J.A. 331-32.[4] Defense counsel, acknowledging his responsibility to zealously protect his client's interests and to make an

---

[4] Indeed, in an earlier appeal before us the district court made clear that it has "always given stiffer sentences" to "individuals bringing drugs into West Virginia from out of state." United States v. Perry, No. 2:10-cr-00139 (S.D. W. Va. May 6, 2011) (ECF No. 101, at 15), aff'd, 456 Fed. App'x 226, (Continued)

adequate record, respectfully, and understandably, objected to the court's above comments and thereby preserved the issue for review.

Although, in light of Diamond, the record is not entirely free of ambiguity, i.e., whether a resident drug dealer in West Virginia, whose source of supply is out of state and who travels herself to import those drugs into the district, would also be subject to "stiffer sentences," we conclude that the district court did not err or otherwise abuse its sentencing discretion. Ultimately, the district court sentenced McGee to a term of imprisonment in the middle of the applicable advisory Guidelines range (after awarding an acceptance of responsibility adjustment over the government's objection), and considered the particular criminal history of the defendant, as well as the specifics of his offense and the need for deterrence – all factors appropriate for consideration under 18 U.S.C. § 3553(a). Accordingly, we hold that the sentence was not procedurally unreasonable for lack of individualized assessment.

_____

2011 WL 6000705 (4th Cir. Dec. 1, 2011) (unpublished). See also United States v. Loper, 293 F. App'x. 999 (4th Cir. 2008) ("Moreover, [the district court] stated that it believed the sentence was appropriate given the amount of drugs involved in this case, Loper's significant criminal history, and the fact that Loper was involved in bringing drugs into West Virginia from out of state.").

22

V.

For the foregoing reasons, the judgment is

AFFIRMED.