**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4874

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

FRANKIE LANE DOCTOR, SR., a/k/a Nose,

Defendant – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Columbia.  Joseph F. Anderson, Jr., Senior District Judge.  (3:05-cr-00681-JFA-1)

Submitted:  March 26, 2020                          Decided:  May 4, 2020

Before GREGORY, Chief Judge, FLOYD, and HARRIS, Circuit Judges.

Affirmed by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Floyd and Judge Harris joined.

Emily Deck Harrill, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina, for Appellant.  Sherri A. Lydon, United States Attorney, Alyssa Leigh Richardson, Assistant United States Attorney, Stacey Denise Haynes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

GREGORY, Chief Judge:

Frankie Lane Doctor, Sr., appeals the district court's revocation of his supervised release and resulting sentence, citing three primary errors. First, Doctor claims the court erred in finding the government proved he committed the assault underlying the supervised release violation. Second, even if the government had proven he perpetrated the assault, Doctor asserts the court failed to announce the specific state offense he committed. Third, he argues that the court improperly used the conduct-specific approach—rather than the categorical approach—to determine that the assault qualified as a crime of violence under the Sentencing Guidelines, which affected the advisory Guidelines range for his sentence. For the reasons that follow, we affirm the district court.[1]

I.

A.

In 2005, a jury found Doctor guilty on two counts: (1) felon in possession of a firearm, and (2) possession with intent to distribute cocaine base. The district court deemed Doctor an armed career criminal and sentenced him to 262 months in prison followed by 5 years of supervised release. In early 2018, the district court granted Doctor's 28 U.S.C.

---

[1] We also deny as moot Doctor's motion to expedite. (ECF No. 49.) We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before us and argument would not aid the decisional process.

§ 2255 petition and reduced his sentence to time served and three years of supervised release.[2] Doctor began serving his supervised release term on February 9, 2018.

On August 7, 2018, Doctor's probation officer filed a report alleging Doctor committed three violations of his supervised release. First, Doctor engaged in new criminal conduct—namely, on July 31, 2018, he was arrested and charged with second-degree assault and battery in Richland County, South Carolina ("Violation One"). Second, he tested positive for cocaine use ("Violation Two"). Third, he failed to notify his probation officer of his contact with law enforcement when police questioned him about the alleged assault ("Violation Three"). Another violation was later added to reflect Doctor's failure to notify his probation officer of his arrest on the assault charge ("Violation Four").

The district court held a two-day hearing on the violations in November 2018. Doctor admitted Violations Two and Three. The district court dismissed Violation Four because Doctor had instructed a family member to notify the probation officer of his arrest, and the family member complied. Accordingly, the only contested violation was the criminal conduct related to the assault in Violation One, which is the subject of this appeal.

At the hearing, the government first called the victim of the assault, Tony Pearson, a disabled veteran. Pearson indicated he met Doctor, whom he called "Nose Doctor," when Pearson purchased crack cocaine from Doctor through a third party. Pearson testified that

---

[2] The petition was based on the Supreme Court's holding in *Johnson v. United States*, which prohibited imposing increased sentences pursuant to the vague residual clause of the Armed Career Criminal Act. 135 S. Ct. 2551, 2557, 2563 (2015). Under *Johnson*, Doctor should have received a sentence of no more than 120 months, a sentence he overserved by about three years before obtaining relief.

3

on July 18, 2018, around 6:00 p.m., he went to the residence of a friend, Rondell "Pop" Bennett, to "get[] high, drink[], and . . . just hang[] out." J.A. 43. Several other people were at Pop's house when Pearson arrived, including Pop; Doctor; Doctor's son, Chris "Furby" Doctor; Doctor's sister, Frances "Jenny" Brice; Doctor's girlfriend, Michelle Clifton; and a woman named Renea. Pearson drank several beers and smoked a small amount of crack cocaine that evening but testified that he was "back to normal" by the time of the assault. J.A. 46.

Later in the evening, Pearson lent his car to Doctor's girlfriend, Michelle, and Doctor's sister, Jenny, to go to the store for beer and cigarettes. Doctor and Furby had left Pop's house, but they returned around the time Michelle and Jenny came back from the store. While Doctor was in the kitchen, he leaned toward the living room and asked, "You got a problem with my mother fucking son[?]" J.A. 48. Pearson believed this was directed to him because he was the only one in the living room.

Doctor then entered the living room and sat down to the left of Pearson. Furby stood in front of Pearson with an empty liquor bottle in his hand and threatened to "slap the shit out of [Pearson] with [the] bottle." J.A. 49. Pearson did not do anything to prompt Furby's behavior and was "shocked" by it. *Id.* Pearson took the bottle from Furby and walked into the kitchen, where he used his cell phone to call Doctor's niece and ask her to tell Furby that Pearson was not a bad person. Furby entered the kitchen and snatched the phone from Pearson's hand. Doctor remained in the living room during this exchange.

Pearson returned to the living room and sat on the couch. Doctor was seated in a chair to Pearson's left and Furby stood in front of Pearson. Furby then punched Pearson

4

in the face. In response, Pearson got up and "slammed" Furby onto the couch. J.A. 50. When Pearson turned around, Doctor screamed, "That's my mother fucking son," before punching Pearson in the left side of his face. *Id.* By that time, Furby had gotten up, and he punched Pearson in the right side of his face. Then, Doctor "punch[ed Pearson] again in the left side of [his] face." *Id.* As Pearson put it, "they double-team[ed] me." J.A. 51. Pop came into the room and said something to the men that Pearson could not hear due to the fighting. Doctor responded by telling Pop, "Shut the fuck up before we beat your ass." J.A. 50. Pop ran into the kitchen and no one else attempted to intervene.

Pearson grabbed a cushion from the couch and placed it across his head while "they continue[d] to beat [him]." J.A. 51. With the cushion over his head, he could not tell who was hitting him. He was "positive," however, that Doctor hit him on the left side of his face at least two times before he shielded himself with the cushion. J.A. 52. Pearson estimated the assault lasted at most fifteen minutes before paramedics rushed in. He declined medical attention and returned home to call the police.

A police officer responded to Pearson's complaint that same night. The officer's report indicated that according to Pearson, two unknown males began an altercation with him. One threatened to hit him with a liquor bottle, and when Pearson pushed the bottle away, a fight ensued. A second male then jumped into the fight and hit Pearson. To identify these men, Pearson indicated "it could [have] been one of the Doctor brothers and the father." J.A. 228.[3] The officer photographed Pearson's injuries.

---

[3] Volume II of the J.A.—pages 199 through 284—was filed under seal. To the extent this opinion quotes from the sealed volume, it does not disclose confidential matters.

The day after the assault, Pearson sought medical attention from the Veterans Affairs ("VA") hospital. To explain his visit, he told medical personnel that two men he had never seen before "jumped" him. J.A. 203. He reported that an initial assailant and the assailant's father punched him repeatedly in the head. Medical staff noted his right eye was swollen shut and his tongue was bruised and swollen. He received stitches near his right eye. According to Pearson, the assault led to a loss of vision and sensitivity to light. He continued to experience jaw pain and headaches for several months.

Pearson also testified that a couple of days after the fight, he contacted Doctor through a three-way call involving Doctor's niece. Pearson told Doctor, "That was fucked up what y'all did to me. . . . Y'all was wrong as hell." J.A. 54. Pearson then invited Doctor and Furby to fight him and said that if they beat him, he would not press charges.

At the revocation hearing, the government also called as a witness Aubree Torres, an investigator from the Richland County Sheriff's Department. Torres was not the responding officer on the night of the incident, but she was assigned to the complaint Pearson filed. On July 26, 2018, she contacted him by phone to discuss the incident. On the call, Pearson informed Torres that Doctor and Furby had assaulted him. Torres found Pearson credible because "he was able to recall a lot of details and depth" about the assault. J.A. 82. Torres asked Pearson to come to the station to make a written statement, which he did, and his written statement was consistent with what he reported over the phone. When Torres saw Pearson—eight days after the assault—she noticed he wore dark sunglasses, which he explained was due to sensitivity to light. Torres photographed his injuries, observing that his eye was watering and involuntarily shutting during the process.

6

Torres also testified that she spoke with Pop and transcribed a statement regarding his version of the assault.[4] Pop recalled that Pearson was sitting on the couch when Doctor and Furby entered the room and started beating Pearson up, causing injuries to his face and eye. When Pop tried to intervene, they threatened to beat him up, too. Torres described Pop's statement as consistent with Pearson's version of events.

Furby then testified that the fight began because he took too long to supply the drugs Pearson had requested.[5] As a result, Pearson jumped out of his chair and "jabbed [Furby] in the face with his hand," which Furby perceived as the first blow of the fight. J.A. 103. According to Furby, Doctor eventually pulled him away from Pearson. At no time did Furby see Doctor hit, punch, or otherwise assault Pearson—although he noted he could not "attest to something that [he] didn't see." J.A. 109. Furby also admitted that his memory was faulty due to impairment from drugs and alcohol.

Doctor's sister, Jenny, testified next. She indicated that Furby jumped on Pearson and she instructed Doctor to help Pearson. She watched Doctor try to pull Furby off of Pearson, but she left when she "saw all that blood." J.A. 113. Jenny also testified that she did not see Doctor hit Pearson.

---

[4] Defense counsel objected to Torres' testimony about Pop's statement. The court overruled the objection, first noting the Rules of Evidence do not apply in revocation hearings. *See* Fed. R. Evid. 1101(d)(3). The court then found that permitting the testimony was in the "interest of justice" because there was evidence that witnesses feared Doctor and did not want to testify live. Fed. R. Crim. P. 32.1; *see also Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) (describing a defendant's right to confront adverse witnesses in a revocation hearing unless the court finds good cause to deny it).

[5] Furby was charged with first-degree assault and battery but stated that he understood his right against self-incrimination before testifying.

Doctor's girlfriend, Michelle, similarly testified that she did not see Doctor punch or otherwise assault Pearson. She only saw Doctor attempt to grab Furby and stop him from hitting Pearson. Michelle, however, was not present for the entire fight, as she left when she saw Doctor trying to pull Furby away from Pearson.

Finally, Norma Dunn, who lived with Pop, testified. She emerged from her room to find Furby and Pearson in an altercation. She witnessed Doctor attempt to break up the fight but did not see Doctor punch Pearson. Norma did not witness the entire incident, but she did see the men separated onto different couches at the fight's conclusion before returning to her room.

B.

After hearing all of the evidence, the district court decided "to swallow hard and . . . accept Mr. Pearson's version of what happened." J.A. 161. The court found Pearson credibly testified that "he was assaulted and punched in the face by Chris Doctor and also by Frankie Doctor, Chris' father, who is the defendant here." *Id.* The court "observed the demeanor of the various witnesses with the sharply conflicting versions of what happened." *Id.* The court noted that some defense witnesses had not seen the entire fight; they only saw Doctor trying to pull Furby off of Pearson. Ultimately, the court found the government proved by a preponderance of the evidence that Doctor punched Pearson.

The court then turned to the grade of the supervised release violation, which depended on whether the assault constituted a crime of violence under the Sentencing Guidelines. The court determined this analysis should be based on the defendant's actual conduct, rather than the categorical approach, citing an application note to Guideline

8

§ 7B1.1 that indicates "the grade of the violation is based upon the defendant's actual conduct." J.A. 162. With no published authority from this Court, the district court was persuaded by an out-of-circuit case that relied on the defendant's conduct.

Turning to the actual conduct in this case, the court found that Doctor punching Pearson twice in the face constituted a crime of violence and thus a Grade A violation. As such, Violation One would have carried a Guidelines range of 33 to 41 months but was limited by a statutory maximum of 24 months. If this had been a Grade B violation—as in, not a crime of violence—the Guidelines would have set forth a range of 21 to 27 months, still capped by the 24-month maximum. The court also adopted the supervised release violation report, which identified Violation One for second-degree assault and battery as a Grade A violation. Like a presentence report ("PSR"), the report set forth the conduct underlying the violation, the relevant Guidelines range, and the statutory maximum.

The court sentenced Doctor to 12 months and 1 day on Violation One, with 12 months of supervised release to follow.[6] The additional day, which defense counsel requested, would enable Doctor to shorten his sentence through good behavior. The court noted that even if it erred in its legal analysis regarding the grade of the violation, it would depart upward as necessary to reach a sentence of 12 months and 1 day. The court explained that it varied downward partly because Doctor had overserved his original sentence before obtaining relief pursuant to *Johnson*. The court also discussed the applicable 18 U.S.C. § 3553(a) factors to explain why the sentence was reasonable.

---

[6] The court imposed a concurrent sentence of time served on Violation Two but failed to impose a sentence for Violation Three.

9

Doctor timely appealed as to Violation One.

II.

On appeal, Doctor first argues the district court erred by revoking his supervised release because the government did not prove he participated in the fight, and in any event, the resulting injuries were insufficient to meet the requirements for second-degree assault and battery. Second, assuming the government proved the assault, the district court failed to articulate what offense Doctor committed that constituted a Grade A violation—meaning it qualified as a crime of violence under the Sentencing Guidelines. Finally, the district court should have used the categorical approach, rather than Doctor's actual conduct, to determine whether he committed a crime of violence. The categorical approach would lead to the conclusion that South Carolina second-degree assault and battery is overbroad and therefore not a crime of violence. Accordingly, Doctor committed at most a Grade B violation, which would have resulted in a lower Guidelines range for sentencing.

In response, the government argues that it established Doctor committed second-degree assault and battery. Furthermore, the district court announced Doctor's offense by adopting the violation report, which specified second-degree assault and battery as the new criminal conduct in Violation One. The court also properly relied on Doctor's actual conduct to determine he committed a crime of violence and thus a Grade A violation. Alternatively, the court should have applied the modified categorical approach, which would have led to the same conclusion. In any event, even if the district court erred in its

10

analysis, the government argues the error was harmless because the court would have imposed the same sentence regardless of any error.

## A.

We turn first to whether the district court erred by finding the government proved Violation One by a preponderance of the evidence. *See* 18 U.S.C. § 3583(e)(3) (permitting courts to revoke supervised release upon finding a violation by a preponderance of the evidence). "This standard requires only that the existence of a fact be more probable than its nonexistence." *United States v. Padgett*, 788 F.3d 370, 374 (4th Cir. 2015) (internal quotation marks and citation omitted).

We review a district court's decision to revoke supervised release for abuse of discretion. *Id.* at 373. But we review the factual findings underlying a revocation for clear error. *Id.* "Under the clear error standard, we will only reverse if 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Savage*, 885 F.3d 212, 225 (4th Cir. 2018) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). When factual findings are based on the credibility of witnesses, we give great deference to the district court's determinations. *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012). We typically only disturb credibility determinations when objective evidence contradicts the witness' story or the story is so internally inconsistent or implausible that a reasonable finder of fact would not credit it. *United States v. McGee*, 736 F.3d 263, 271 (4th Cir. 2013).

11

i.

In this case, despite Pearson's involvement with drugs and alcohol, the district court "observed [his] demeanor" as he testified and found his version of events credible. J.A. 161. On appeal, we see nothing so internally inconsistent or implausible about the account Pearson gave—as the victim of the assault—that would cause us to disturb the district court's credibility determination. *See McGee*, 736 F.3d at 271.

Aside from initially telling paramedics on the scene that he did not know what happened, Pearson consistently reported to police and medical personnel that *two* males assaulted him, even though he did not always identify his attackers by name. *See, e.g.*, J.A. 203, 207 (telling VA staff that two unknown men—an individual and his father—"jumped" him). He informed an officer on the night of the incident that his assailants might have been "one of the Doctor brothers and the father." J.A. 228. He twice reported to Investigator Torres that Furby and Doctor had assaulted him. Additionally, Pop, whose statement the court accepted through Torres, witnessed both Furby and Doctor hitting Pearson.

Doctor's witnesses, including his sister and girlfriend, testified that they did not see Doctor punch Pearson. But most of them did not see the entire fight. Jenny and Michelle left before the fight ended, and Norma did not come out of her room in time to see the beginning of the fight. While Doctor's son, Furby, was present for the entire fight, he admitted his memory was blurred by drugs and alcohol. Moreover, Furby noted that although he did not see Doctor punch Pearson, he could not attest to what he did not see.

12

There is no evidence in the record that directly contradicts Pearson's version of events or makes his testimony implausible to a reasonable factfinder. Accordingly, we will not disturb the district court's credibility determination. Based on Pearson's credible testimony, the district court did not clearly err by finding that Doctor punched Pearson.[7]

ii.

Because the district court did not err in finding that Doctor punched Pearson, the next question is whether Doctor's conduct qualified as second-degree assault and battery, the offense set forth in the violation report. Under South Carolina law, a person commits second-degree assault and battery:

> if the person unlawfully injures another person, or offers or attempts to injure another person with the present ability to do so, and:
>
> (a) moderate bodily injury to another person results or moderate bodily injury to another person could have resulted; or
>
> (b) the act involves the nonconsensual touching of the private parts of a person, either under or above clothing.

S.C. Code Ann. § 16-3-600(D)(1). "Moderate bodily injury" as set forth in subsection (a) means:

> physical injury that involves prolonged loss of consciousness, or that causes temporary or moderate disfigurement or temporary loss of the function of a bodily member or organ, or injury that requires medical treatment when the treatment requires the use of regional or general anesthesia or injury that results in a fracture or dislocation. Moderate bodily injury does not include

---

[7] When announcing its findings, the district court remarked that Doctor struck Pearson at the "conclusion" of the fight. J.A. 161. Doctor contends the court erred since Pearson had a pillow over his head at the end of the fight and did not know who punched him at that point. But the court's mischaracterization of Pearson's testimony does not mean it clearly erred by adopting Pearson's version of events; indeed, Pearson's testimony unequivocally described Doctor punching him *before* he placed the pillow over his head.

13

one-time treatment and subsequent observation of scratches, cuts, abrasions, bruises, burns, splinters, or any other minor injuries that do not ordinarily require extensive medical care.

*Id.* § 16-3-600(A)(2). Doctor asserts that because Pearson did not suffer a moderate bodily injury, he committed at most a lesser degree of assault.

A person, however, can be guilty of second-degree assault and battery if "moderate bodily injury to another person *could have* resulted." *Id.* § 16-3-600(D)(1) (emphasis added). Here, the evidence showed that Pearson required stitches, his eye swelled shut, his tongue was bruised, his vision suffered, and he experienced prolonged jaw pain and headaches. Even if these do not constitute moderate bodily injuries, we see no clear error in finding that punching Pearson in the face as described in the record *could have* resulted in "prolonged loss of consciousness," "disfigurement or temporary loss of the function of a bodily member or organ," medical treatment requiring "the use of regional or general anesthesia," or "a fracture or dislocation," as set forth in the statute. *Id.* § 16-3-600(A)(2). Indeed, Doctor points us to no case that instructs otherwise.[8]

Thus, Doctor's argument that Pearson did not suffer the necessary injuries for second-degree assault and battery does not leave us "with the definite and firm conviction" that the district court made a mistake in finding Doctor committed Violation One. *Savage*, 885 F.3d at 225. The district court did not clearly err in this regard.

_____

[8] Furthermore, because the statute only requires the possibility of moderate bodily injury, Doctor's attempt to parse out which assailant actually caused which of Pearson's injuries is unavailing.

14

B.

Doctor next asserts the district court procedurally erred by failing to announce that Doctor committed second-degree assault and battery. He claims that the district court's failure thwarts appellate review because this Court cannot discern what offense Doctor committed in Violation One. Because he raises this issue for the first time on appeal, we apply plain error review. *United States v. Webb*, 738 F.3d 638, 640 (4th Cir. 2013). Thus, Doctor must show (1) the district court erred; (2) the error was plain; and (3) the error affected his substantial rights, meaning it affected the outcome of the proceedings. *United States v. Olano*, 507 U.S. 725, 732–34 (1993). The error also must have seriously affected the fairness, integrity, or public reputation of the proceedings. *Id.* at 732.

Doctor points to a Third Circuit case in which the district court had erred by failing to indicate the particular crime the defendant committed as a violation of his supervised release. *See United States v. Carter*, 730 F.3d 187, 192–93 (3d. Cir. 2013). Instead, the district court merely stated that the defendant committed "a forcible sexual offense." *Id.* at 192. The appellate court could not determine whether the offense was a crime of violence under the Guidelines because doing so would require speculating as to which federal or state offense the district court believed the defendant committed.[9] *Id.* at 193.

Here, by contrast, we need not speculate about the district court's findings. The court stated on the record—more than once—that it adopted the violation report for purposes of sentencing. In adopting the report, the court overruled Doctor's objection to

_____

[9] The Third Circuit ultimately did not need to decide whether the offense was a crime of violence, because the district court's error was harmless. *Carter*, 730 F.3d at 193.

15

it. The report specified that Violation One was based on Doctor's arrest for second-degree assault and battery. Nothing in the record suggests the district court meant to find Doctor committed anything other than second-degree assault and battery. Accordingly, unlike in *Carter*, we are not precluded from meaningful review of the district court's decision.

Even if the district court erred in announcing Doctor's offense by adopting the violation report, that error was not plain. Indeed, this Court has held that when resolving objections to a PSR, a district court "may simply adopt the findings contained in a PSR, provided that it makes clear which disputed issues were resolved by its adoption," thus allowing for effective appellate review. *United States v. Bolden*, 325 F.3d 471, 497 (4th Cir. 2003) (internal quotation marks and citation omitted). The "court need not articulate [findings] as to disputed factual allegations with minute specificity." *Id.* (alteration in original). The principles set forth in *Bolden* could logically extend from PSRs to supervised release violation reports, such that any error by the district court was not "clear" or "obvious."[10] *Olano*, 507 U.S. at 734. In any event, Doctor has not identified how this lack of clarity affected his substantial rights pursuant to *Olano*'s third prong. *Id.*

Thus, the district court did not commit plain error by adopting the violation report when announcing Doctor committed Violation One.

---

[10] We recognize that PSRs and violation reports are distinct documents prepared for separate criminal proceedings. But for purposes of this appeal, the district court did not plainly err by adopting the violation report like a court would adopt a PSR at sentencing.

## C.

Next, we turn to the district court's decision that Doctor's commission of South Carolina second-degree assault and battery constituted a crime of violence under the Guidelines. Doctor argues the court should have applied the categorical approach to determine his offense was not a crime of violence and thus not a Grade A violation, which would have resulted in a lower Guidelines range for sentencing.

### i.

Under the Sentencing Guidelines, a Grade A violation involves, for purposes of this appeal, an offense punishable by a term of imprisonment exceeding one year that is a "crime of violence." U.S.S.G. § 7B1.1(a)(1). The Guidelines define "crime of violence" as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another."[11] *Id.* § 4B1.2(a)(1). A Grade B violation, on the other hand, involves only an offense punishable by a term of imprisonment exceeding one year. *Id.* § 7B1.1(a)(2). Because South Carolina second-degree assault and battery carries the possibility of imprisonment for more than one year, it could qualify as either a Grade A or a Grade B violation. S.C. Code Ann. § 16-3-600(D)(2). Thus, to determine the violation grade, we must ask whether second-degree assault and battery is a crime of violence.

To answer that question, the district court examined Doctor's actual conduct. Since Doctor's revocation hearing, however, this Court has applied the categorical approach to

---

[11] The definition also includes certain delineated offenses, such as murder and aggravated assault, none of which are relevant here. U.S.S.G. § 4B1.2(a)(2). Although the government argued Doctor committed aggravated assault below, that argument is not made on appeal.

17

decide whether a state offense is a crime of violence under the Guidelines. *United States v. Simmons*, 917 F.3d 312, 316 (4th Cir. 2019) ("To determine whether North Carolina [assault with a deadly weapon on a government official] is a 'crime of violence' under the Sentencing Guidelines, we apply the familiar categorical approach."). Accordingly, application of the conduct-specific approach in these circumstances is not proper.

The categorical approach examines only the elements of the offense. *Id.* at 317. "[I]f the offense can be committed without satisfying the definition of crime of violence, then it is overbroad and not a categorical match." *Id.* at 316–17 (internal quotation marks and citation omitted). Doctor argues that an individual can commit second-degree assault and battery by "nonconsensual touching," S.C. Code Ann. § 16-300(D)(1)(b), which the Supreme Court has excluded from the Guidelines' definition of a crime of violence. *United States v. Salmons*, 873 F.3d 446, 448–49 (4th Cir. 2017). Thus, Doctor asserts, the statute is overbroad and his offense is not categorically a crime of violence.

The government argues that we should apply the modified categorical approach, since the South Carolina statute is "divisible," meaning it defines multiple crimes. *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016). Under this approach, we determine which crime a defendant committed and apply the categorical approach only to that offense. *Id.* In the government's view, the statute sets forth two crimes, one involving moderate bodily injury, and one involving nonconsensual touching. *See United States v. Butler*, 760 F. App'x 194, 196 (4th Cir. 2019) (applying the modified categorical approach to S.C. Code Ann. § 16-3-600(D)(1) based on the parties' agreement). Because Doctor committed the

18

former crime, the government says, we need only examine whether that constitutes a crime of violence, and it does.

ii.

But we need not decide whether the categorical or modified categorical approach applies to South Carolina second-degree assault and battery because, even if the district court erred in concluding the offense was a crime of violence, the error was harmless.

We review a sentence under a "deferential abuse-of-discretion standard." *United States v. McDonald*, 850 F.3d 640, 643 (4th Cir. 2017). We first examine whether the district court committed a procedural error, and if we find none, we consider the substantive reasonableness of the sentence. *Id.* "We will not disturb a district court's revocation sentence unless it falls outside the statutory maximum or is otherwise plainly unreasonable." *Padgett*, 788 F.3d at 373 (internal quotation marks and citation omitted).

It is not necessary, however, to vacate a sentence based on an alleged Guidelines error if we can determine from the record that the error is harmless. *McDonald*, 850 F.3d at 643. Indeed, "it would make no sense to set aside [a] reasonable sentence and send the case back to the district court" when the court "has already told us that it would impose exactly the same sentence, a sentence we would be compelled to affirm." *Id.* at 645. Instead, we may assume that a sentencing error occurred and proceed to examine whether the error affected the defendant's sentence. *Id.* at 643. There are two prongs of this "assumed error harmlessness inquiry." *Id.* First, we require "knowledge that the district court would have reached the same result even if it had decided the [G]uidelines issue the

19

other way." *Id.* Second, we must make "a determination that the sentence would be reasonable even if the [G]uidelines issue had been decided in the defendant's favor." *Id.*

For purposes of this analysis, we assume Doctor's offense was not a crime of violence and turn to (1) whether the district court would have arrived at the same sentence if it had found Doctor committed a Grade B violation, and (2) whether that sentence is reasonable. As for the first question, the district court made clear that even if it erred, it "would depart upward if necessary" to reach 12 months and 1 day. J.A. 187. The court believed the sentence was "appropriate . . . based on the totality of the record," which included Doctor's over-service of his original sentence. *Id.* Noting the statutory maximum was 24 months regardless of the violation grade, the court decided "to split it down the middle at 12 months and [1] day." J.A. 186. Thus, "the district court's sentencing intent was . . . clear from the record." *McDonald*, 850 F.3d at 645; *see also United States v. Gomez-Jimenez*, 750 F.3d 370, 383 (4th Cir. 2014) (finding the district court made its intent clear: "If, however, for some reason someone were to determine that I did not [properly calculate the advisory Guidelines range], I announce an alternative variant sentence[.]").

Next we must decide if Doctor's sentence is substantively reasonable. This entails looking to "the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in [18 U.S.C.] § 3553(a)." *Gomez-Jimenez*, 750 F.3d at 383. When revoking a defendant's term of supervised release, a court must consider certain factors set forth in § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant,

20

the need to afford adequate deterrence, and the need to protect the public. *See* 18 U.S.C. § 3583(e) (citing § 3553(a)).

In this case, the district court adequately addressed the relevant § 3553(a) factors when imposing Doctor's sentence. As for the nature and circumstances of the offense, the court found Doctor had committed a "serious offense" when he and Furby repeatedly punched Pearson and caused bruising and lacerations. J.A. 187. Doctor had a criminal history at the top of the scale and his original PSR listed numerous previous convictions, leading the court to observe he had "a significant criminal history." J.A. 188. The court also considered the need for adequate deterrence and to protect the public from Doctor.

Additionally, and importantly, the district court imposed a sentence well below the Guidelines range for *either* a Grade A violation *or* a Grade B violation. *Cf. Gomez-Jimenez*, 750 F.3d at 389 (Gregory, J., concurring in part and dissenting in part) (noting the sentence imposed exceeded what would have been the Guidelines range absent the court's calculation error). The court sentenced Doctor to 12 months and 1 day, even though the range for a Grade A violation was 24 months pursuant to the statutory maximum. But the sentence also fell considerably below the range for a Grade B violation, which was 21 to 24 months. In other words, Doctor's sentence was lower than the Guidelines would have advised if the court had found no crime of violence. Thus, the court did not "anchor" the sentence "to an improperly calculated Guidelines range." *Simmons*, 917 F.3d at 315.

We cannot find—nor does Doctor cite—a reason that this variant sentence would be substantively unreasonable if the court had found he committed a Grade B violation.

21

Accordingly, even if the district court erred in sentencing Doctor for a Grade A violation, the error was harmless.

## III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*